Jessie W. MELLER, Plaintiff-Appellee
and Cross-Appellant,

v.

The HEIL COMPANY, Defendant-Appel-
lant and Cross-Appellee.

Nos. 82–1858, 82–1883.

United States Court of Appeals,
Tenth Circuit.

Jan. 16, 1984.

**1298**

Thomas L. Roberts of Pryor, Carney & Johnson, Englewood, Colo., for defendant-appellant and cross-appellee.

James L. Hammer of Gueck & Hammer, Englewood, Colo., for plaintiff-appellee and cross-appellant.

Before McKAY, LOGAN and SEYMOUR, Circuit Judges.

McKAY, Circuit Judge.

After examining the briefs and the appellate record, this three-judge panel has determined unanimously that oral argument would not be of material assistance in the determination of this appeal. *See* Fed.R. App.P. 34(a); 10th Cir.R. 10(e). The cause is therefore ordered submitted without oral argument.

Jean Meller drove a dump truck for a Colorado employer. On May 21, 1979, his body was discovered pinned between the dump bed and chassis of his truck. It appears that Mr. Meller was greasing the chassis when the bed released from an upright position.

Mr. Meller's wife, Jessie Meller, filed this diversity action for wrongful death under Colorado law [1] against the Heil Company, the manufacturer of the dump bed assembly. She charged that Heil was strictly liable in tort for defective design. A jury agreed and the court entered judgment against Heil for $431,024.13 plus costs.

Heil appeals from the judgment, claiming that the court erred in admitting evidence of post-manufacture changes in the design of the dump bed assembly, in excluding evidence of drug paraphernalia that was in the decedent's possession at the time of his death, in failing to instruct the jury on the defense theory of product misuse, and in failing to set aside the verdict as excessive. The plaintiff cross-appeals, claiming that the court incorrectly calculated the bill of costs and interest on the judgment.

*Post-Manufacture Design Changes*

Heil's dump bed assembly uses a hydraulic hoist to raise the bed from the chassis. The hoist consists of a telescoping cylinder attached to the front end of the dump bed and a hydraulic-oil pump powered by the truck engine. The pump forces oil into the cylinder, causing the cylinder to elongate and the dump bed to rise. The elevation of the bed is controlled by a three-position valve. The first position admits oil into the cylinder, raising the dump bed. The sec-

---

**1.** *See* Colo.Rcv.Stat. §§ 13–21–201 to 204 (1973 & Supp.1982).

ond position halts the oil flow, maintaining the dump bed at a given level. The third position drains oil from the cylinder, contracting the cylinder and lowering the dump bed. When the cylinder is fully extended and the bed fully raised, a "trip cable" automatically switches the valve from the first to the second position to prevent overpressuring of the cylinder. The trip cable runs from the valve, along the chassis, to the dump bed. As the bed ascends, the cable tautens and mechanically switches the valve to the second position, stopping the movement of the cylinder and the bed. Under Heil's design, further stretching of the cable switches the valve to the third position, draining the hydraulic oil from the cylinder and lowering the bed.

The evidence at trial suggested that Mr. Meller inadvertently touched an unshrouded portion of the trip cable while working beneath the fully elevated dump bed. His contact was sufficient to switch the valve from the second to the third position and drop the bed before he could escape.[2] The plaintiff claimed that the accident occurred because Heil's design of the dump bed assembly was unreasonably dangerous and therefore defective under Colorado law. *See Union Supply Co. v. Pust*, 196 Colo. 162, 583 P.2d 276, 280 (1978).

In attempting to prove that the design was unreasonably dangerous, the plaintiff offered evidence of Heil's subsequent design changes. The evidence included changes in the valve design, the addition of props used to block the dump bed when it was in an upright position, and correspondence from Heil warning of dangers associated with the trip cable. The court admitted the evidence with a cautionary instruction to the jury that the design changes "are not to be considered as an admission

that earlier design was defective in any way, but simply that there is possibly an alternative feasible design; another way to do it, in other words." Record, vol. 4, at 19. The defendant contends that the admission of this evidence violated Rules 407 and 403 of the Federal Rules of Evidence, as well as substantive provisions of Colorado law.

Rule 407 provides as follows:

When, after an event, measures are taken which, if taken previously, would have made the event less likely to occur, evidence of the subsequent measures is not admissible to prove negligence or culpable conduct in connection with the event. This rule does not require the exclusion of evidence of subsequent measures when offered for another purpose, such as proving ownership, control, or feasibility of precautionary measures, if controverted, or impeachment.

Fed.R.Evid. 407. The Advisory Committee note indicates that the rule has two justifications. First, subsequent remedial measures are of limited probative value as an admission of fault. Second, and more importantly, exclusion of remedial measures favors "a social policy of encouraging people to take, or at least not discouraging them from taking, steps in furtherance of added safety." Fed.R.Evid. 407 advisory committee note.

While Rule 407 recognizes the importance of encouraging safety improvements, it also recognizes that this salutory social policy must be balanced against competing interests.[3] Chief among these other interests is the admission of relevant, probative evidence. Rule 407 strikes a balance by excluding subsequent remedial measures only when used as evidence of the defendant's "negligence or culpable conduct."[4]

---

**2.** The evidence indicated that an application of approximately eight pounds of pressure on the cable would switch the valve position. When the valve was switched, the bed would descend in about two seconds.

**3.** Rule 407 does not ban the admission of all "repair evidence." Instead, it selectively excludes such evidence, depending on the purpose for which it is offered. In doing so, Rule 407

implicitly recognizes that there are interests that override the policy of encouraging subsequent remedial measures. In this sense, Rule 407 represents a balance of competing interests rather than a broad social policy directive.

**4.** The Advisory Committee note states, "Exclusion is called for *only* when the evidence of subsequent remedial measures is offered as proof of negligence or culpable conduct. In

It permits introduction of such measures to prove other controverted issues, provided that introduction of this evidence meets the remaining admissibility requirements of the Federal Rules of Evidence.[5]

■ In the instant case, the plaintiff presented a claim of strict liability in tort. She alleged that Heil's product design was unreasonably dangerous, and she offered evidence of subsequent remedial measures to show the feasibility of alternative designs. The evidence was not offered to show negligence or culpable conduct, but instead for a purpose permissible under Rule 407.[6] Contrary to Heil's assertions, the feasibility of alternative designs was a controverted issue at trial.[7] Thus, Rule 407 did not bar the admission of the plaintiff's evidence.[8]

effect, [the rule] rejects the suggested inference that fault is admitted." Fed.R.Evid. 407 advisory committee note (emphasis added).

5. *See id.* Neither the Advisory Committee note nor the legislative history of the rule indicate why repair evidence is excluded only when offered to show "negligence or culpable conduct." The choice of this particular standard presumably reflects a conclusion by the drafters that such evidence, on balance, is markedly less probative on these particular issues than on others.

6. The Advisory Committee note specifically recognizes the use of subsequent remedial measures "for the purpose of showing that design changes and safeguards were feasible." *Id.*

7. The plaintiff bore the burden of proving that Heil's product was "unreasonably dangerous." *See Union Supply Co. v. Pust,* 196 Colo. 162, 583 P.2d 276 (1978). The feasibility of alternative designs was a factor essential to her theory of the unreasonable danger the product posed. *Cf.* S. Saltzburg & K. Redden, Federal Rules of Evidence Manual 180 (3d ed. 1982) (feasibility will almost always be in question in design defect cases). Indeed, Colorado law recognizes that "the failure to provide safety devices can be the basis of a [strict liability] design defect case." *Union Supply,* 583 P.2d at 280. Heil did not stipulate that alternative designs were feasible, and the plaintiff was therefore obligated to prove this element of her case. The defendant cannot now assert that, because it did not attempt to rebut the plaintiff's proof, the issue was not controverted at trial. *See* Fed.R.Evid. 407 advisory committee note ("The requirement that the other purpose be controverted calls for automatic exclusion unless a genuine issue be present and *allows the opposing party to lay the groundwork for exclusion by making an admission.*") (emphasis added). We conclude that, under these circumstances, the feasibility of an alternative design is deemed controverted unless the defendant makes an unequivocal admission of feasibility. *See* 23 C. Wright & K. Graham, Federal Practice and Procedure § 5288 at 144 (1980).

8. There is some dispute among the federal courts concerning the application of Rule 407 in strict liability actions. *See Grenada Steel Indus.*

*v. Alabama Oxygen Co.,* 695 F.2d 883 (5th Cir. 1983) (providing an exhaustive summary of the cases and commentary). A number of courts have applied Rule 407 to exclude evidence of subsequent remedial measures offered to prove that a product is defective. *E.g., Grenada,* 695 F.2d at 889; *Cann v. Ford Motor Co.,* 658 F.2d 54, 60 (2d Cir.1981), *cert. denied,* 456 U.S. 960, 102 S.Ct. 2036, 72 L.Ed.2d 484 (1982); *Werner v. Upjohn Co.,* 628 F.2d 848, 856–59 (4th Cir.1980), *cert. denied,* 449 U.S. 1080, 101 S.Ct. 862, 66 L.Ed.2d 804 (1981). The Eighth Circuit does not follow this approach. It holds that Rule 407 does not apply to strict liability cases. *Farner v. Paccar, Inc.,* 562 F.2d 518, 528 (8th Cir.1977). Having examined the conflicting authorities, we find none of their analyses persuasive.

As previously described, Rule 407 balances a social policy of encouraging repairs against a competing interest in the admission of relevant, probative evidence. In striking the balance, it announces a clear rule: repair evidence is not admissible to prove negligence or culpable conduct, but may be admissible for other purposes. Under this rule, admissibility is not determined by categorizing a party's legal theory as negligence or strict liability, but instead, by examining the contention that the evidence is offered to prove. In a strict product liability claim, negligence and culpable conduct generally are not relevant issues. Thus, any evidence offered to prove these issues generally will be inadmissible under the general requirements of relevance, *see* Fed.R.Evid. 402, even in the absence of Rule 407. Similarly, evidence of subsequent product changes will usually be irrelevant as direct proof of the ultimate contention that the product is unreasonably dangerous. Products are modified for a host of reasons unrelated to safety, and therefore the modification itself typically does not have any tendency to make more probable the past dangerousness of the product. *See* Fed.R.Evid. 401. Product modifications may be relevant, however, to factual issues that underlie the ultimate contention of dangerousness. For example, a product modification may demonstrate the feasibility of an alternative design (though it may not indicate that the alternative design is safer than an old design or that it was feasible at the time of first manufacture). *See* R. Lempert & S. Saltzburg, A Modern Approach to Evidence 189 (1977). Rule 407 does

An application of Rule 407 does not end our inquiry; the challenged evidence must pass muster under other rules of evidence as well. Heil claims that the evidence should have been excluded under Rule 403 because it was unfairly prejudicial. *See* Fed.R.Evid. 403. The Advisory Committee states that evidence is unfairly prejudicial if it has "an undue tendency to suggest decision on an improper basis." Fed.R. Evid. 403 advisory committee note. We conclude that any such tendency in this case was eliminated by the court's instruction to the jury, cautioning it to consider the evidence only with respect to the feasibility of alternatives. We hold that Rule 403 did not bar admission of the evidence.

■ Heil further argues that, even if the evidence of subsequent design changes was admissible under the Federal Rules of Evidence, it was inadmissible under the substantive law of Colorado. Heil points to Colorado's codification of general provisions of product liability law, which provides in part as follows:

> In any product liability action, evidence of any scientific advancements in technical or other knowledge or techniques, or in design theory or philosophy, or in manufacturing or testing knowledge, techniques, or processes, or in labeling, warnings of risks or hazards, or instructions for the use of such product, where such advancements were discovered subsequent to the time the product in issue was sold by the manufacturer, shall not be admissible for any purpose other than to show a duty to warn.

Colo.Rev.Stat. § 13–21–404 (Supp.1982). Heil claims that this provision is binding on federal courts hearing products liability actions brought under Colorado law, notwithstanding any federal rule of evidence to the contrary. We need not reach the difficult and important issue concerning the reach of the Federal Rules of Evidence raised by Heil's claim [*see Oberst v. International Harvester Co.*, 640 F.2d 863, 867 n. 2 (7th Cir.1980) (Swygert, J., concurring and dissenting); *see generally* Wellborn, *The Federal Rules of Evidence and the Application of State Law in the Federal Courts*, 55 Tex.L.Rev. 371 (1977)] because we do not believe the court violated § 13–21–404 in admitting the disputed evidence and instructing the jury concerning it.

Although not free from doubt, we construe the statute as applicable only to scientific "advancements" in the sense of new discoveries after the original construction.

---

not exclude evidence offered to demonstrate such facts.

In *Grenada,* the Fifth Circuit reasoned that Rule 407 excluded subsequent repairs in strict product liability actions, primarily because "evidence of subsequent repairs or change has little relevance to whether the product in question was defective at some previous time," 695 F.2d at 887, and secondarily, because exclusion in strict liability cases serves purposes analogous to exclusion in negligence cases. *Id.* With respect to the first ground, we note that Rule 407 is an exception to the general rule that relevant evidence is admissible. We see no reason to interpret Rule 407 as imposing a relevance test, since that purpose is already served by Rule 402. With respect to the second ground, a ground relied on in *Cann* and *Werner,* we believe that it is flatly inconsistent with the language of Rule 407. In effect, this approach redefines the terms "negligence" and "culpable conduct," to mean "product defects" when used in a strict liability case. This interpretation is reminiscent of Alice's encounter with Humpty Dumpty. *See* L. Carroll, Through the Looking Glass 198 (Messner ed. 1982) (" 'When I use a word,' Humpty Dumpty said in rather a scornful tone, 'it means just what I choose it to mean—neither more nor less.' ") Authorities adopting this approach claim that it is justified because it advances the policy of encouraging subsequent remedial measures. Such reasoning misconceives Rule 407. The rule does not encourage repairs at all costs; it balances this social policy against the competing interest in admitting relevant, probative evidence. *See supra* note 3. It strikes the balance, for better or worse, at excluding only that evidence offered to prove negligence or culpable conduct. Courts should show due respect for the careful consideration that preceded promulgation of the Federal Rules of Evidence. Absent evidence that either Congress, which prescribed the rules, the Supreme Court, which approved the rules, or the Advisory Committee, which drafted the rules, intended otherwise, we should apply Rule 407 as written. *Accord Herndon v. Seven Bar Flying Service, Inc.,* 716 F.2d 1322 (10th Cir. 1983). *Compare, e.g.,* Neb.Rev.Stat. § 27–407 (1979) (specifically defining "negligence or culpable conduct" to include "manufacture and sale of a defective product").

Alternative concepts implemented later that were known as possible at the time of manufacture would not be excludable. We adopt this view because we believe it accords with the legislative scheme set out in Colo.Rev.Stat. §§ 13–21–401 to 405.

Under this statutory scheme, a product is presumed not to be defective if at the time of its sale it either conformed to the state of the art (as opposed to industry standards), or complied with any applicable state or federal statute or regulation. *Id.* § 403(1)(a) & (b). On the other hand, a product is presumed defective if it failed to comply with an applicable government statute or regulation. *Id.* § 403(2). We assume that a product's failure to conform to the state of the art at the time of its sale is evidence of a defect, although that failure does not rise to a presumption.

These provisions set the stage for proof of the state of the art at the time of the sale of the product. In order to prove the state of the art, evidence of what other manufactures are doing is clearly relevant and admissible. Section 13–21–404, the statute at issue in this case, is not addressed to subsequent remedial measures by the manufacturer, but appears instead to cover scientific advancements made by *anyone* where such advancements were "discovered" subsequent to the time the defendant manufacturer sold the product in issue. Read together with section 13–21–403, the Colorado legislature was merely establishing in section 13–21–404 that subsequent scientific advancements are the flip side of the state of the art at the time of sale, *i.e.,* that if the design change or warning technique was not scientifically known at the time of the sale and therefore not state of the art, it is simply not relevant to whether the product was defective. On the other hand, a subsequent scientific advancement is relevant to a manufacturer's duty to warn its previous purchasers, and therefore it is admissible to show such a duty.

Subsequent to the enactment of section 13–21–401 to 405, the Colorado legislature adopted its own identical version of Fed.R.

Evid. 407. The Committee Comment states: "The phrase 'culpable conduct' is not deemed to include proof of liability in a 'strict liability' case based on defect, where the *subsequent measures are properly admitted* as evidence of the original defect. *But see* § 13–21–404, C.R.S. 1973 (1978 Supp.)." Colorado Rule of Evidence 407, Vol. 7B Colo.Rev.Stat. (1982 Supp.) (emphasis added). Following the two earlier Colorado court decisions in *Roberts v. May,* 41 Colo.App. 82, 583 P.2d 305 (1978), and *Good v. A.B. Chance Co.,* 39 Colo.App. 70, 565 P.2d 217 (1977), the Colorado legislature chose to make Rule 407 inapplicable to products liability cases. The Comment establishes that the legislature contemplated the admission of some kinds of subsequent remedial measures in products liability cases, the exception being the limitation set out in section 13–21–404.

We read section 13–21–404 the way we do in part because it makes no sense that evidence of subsequent remedial measures would be admissible in Colorado to show feasibility in negligence cases, but not admissible in products liability cases under defendant's reading of the section. In our view, feasibility of alternative design is one way of establishing state of the art, proof of which is definitely contemplated by section 13–21–403.

Reading section 13–21–404 the way we do, we are of the view that the burden is upon the person who wants to muffle evidence to show that the advancement in question was "discovered" *subsequent* to the time of the sale. Here defendant argued that the section precluded admission of *any* subsequent remedial measure except to show duty to warn. Although defendant might have been able to make a case for application of section 13–21–404 to the valve design change that Heil patented, defendant failed to distinguish between that "subsequent discovery" and changes in the length of the shroud or use of a safety brace that were probably within the state of the art in 1972. Since defendant failed to show grounds for the application of the Colorado statute, and since 407 does

not exclude this evidence, it is admissible under Rule 402.

### The Decedent's Possession of Drug Paraphernalia

■ In the course of their investigation, the police inventoried Mr. Meller's personal possessions found at the scene of the accident. They discovered two hashish pipes containing marijuana residue in his rucksack. However, they found no evidence that he had used marijuana immediately before the accident.

Heil sought to admit the hashish pipes at trial, claiming that they were probative of the decedent's life expectancy and that they impeached prior testimony by the plaintiff. The district court excluded the pipes, concluding that their probative value was substantially outweighed by the danger of unfair prejudice. *See* Fed.R.Evid. 403. We agree. Heil provided no medical foundation for its claim that Mr. Meller's life expectancy was diminished by drug use. Furthermore, the pipes were of questionable value as impeachment material. Indeed, the testimony Heil sought to impeach involved statements of questionable admissibility that Heil itself had elicited.[9] It appears that Heil sought to introduce the hashish pipes for the specific purpose of arousing juror sentiment against the decedent. The district court clearly acted properly in excluding this evidence.

### Product Misuse

At the close of trial, Heil requested that the jury receive an instruction explaining the defense theory of product misuse. The court denied the request and concluded that the elements of the defense were absent in this case. The court did instruct the jury on the defense theory of assumption of risk; however, Heil argues that it was entitled to an instruction on product misuse as well.

■ Heil's product misuse defense is, in essence, that Mr. Meller caused his own death by choosing to position himself under the dump bed while greasing the truck chassis. As Heil recognizes, the product-misuse defense requires a showing that injury was caused by the dangerous misuse of a product in a manner that could not reasonably have been anticipated by the manufacturer. *E.g., Kinard v. Coats Co.,* 37 Colo.App. 555, 553 P.2d 835, 837 (1976). The defense protects the manufacturer who, in designing a product for a particular use, incorporates safety measures consonant with the full range of foreseeable applications. It recognizes that neither fairness nor the goals of enterprise liability are furthered by assessing liability for injuries arising out of unforeseeable applications of the product. *See generally* W. Prosser, Torts 641–82 (4th Ed.1971).

■ Viewing the defense in this light, it would be a misapplication of language and law to describe Mr. Meller's accident as a result of product misuse. Mr. Meller was performing routine maintenance on the dump truck. To perform the maintenance, he had to work in close proximity to the dump bed assembly. Heil offered no substantial evidence that it could not reasonably foresee Mr. Meller's contact with a part of the dump bed assembly. Indeed, the record contains abundant evidence that Heil should have anticipated the likelihood that a person might place himself between the chassis and the dump bed and thereby encounter the obvious dangers associated with the trip cable. The court wisely declined to exhibit before the jury a defense theory that was unclothed by supporting facts. *See Smith v. Mill Creek Court, Inc.,* 457 F.2d 589, 592 (10th Cir.1972); *Radio Corp. of America v. KYFM, Inc.,* 424 F.2d 14, 19 (10th Cir.1970). Given the evidence adduced at trial, the court acted within its authority in denying the request for an instruction on product misuse. The district court properly distinguished the de-

---

**9.** Heil sought to impeach testimony elicited from the decedent's wife that Mr. Meller smoked marijuana only when offered the drug at the home of friends. Even assuming that the pipes suggested more frequent drug use, we find Heil's suggested inference of diminished life expectancy lacking sufficient support to overcome the danger of unfair prejudice.

fense of assumption of risk, a defense that the jury rejected.

*Sufficiency of the Evidence to Support the Verdict*

The jury awarded the plaintiff $400,000 in damages (prior to addition of interest and costs), which represented Mr. Meller's discounted future earnings. Heil claims that this award is excessive, citing "an extremely unstable and irregular work background." Principal Brief for Appellant at 43.

At trial, the plaintiff's expert witness, an economist at Colorado State University, testified that the present value of the decedent's future earnings was $580,300.00. Heil had ample opportunity to rebut this testimony and, indeed, argued vigorously to the jury that the estimate was excessive. It appears that the jury, in exercising its duties as a finder of fact, gave substantial credence to the expert testimony. We conclude that the verdict is consistent with the evidence presented and represents a reasonable award of damages.

*The Bill of Costs and Interest on the Judgment*

The district court entered a judgment against Heil for $431,024.13 and assessed Heil with the costs of trial. The plaintiff cross-appeals from the judgment, claiming that the court erred in its calculation of the bill of costs and interest on the verdict.

The plaintiff claims that the court erred in excluding certain deposition and expert witness fees in the bill of costs. The plaintiff acknowledges that the award of costs is within the trial court's discretion. *See True Temper Corp. v. CF & I Steel Corp.*, 601 F.2d 495, 509 (10th Cir. 1979). We might, on occasion, question a court's decision to award no costs to a prevailing party. *See id.* We will defer broadly, however, to a district court's determination that certain elements of the bill of costs are not recoverable. The calculation of costs is too closely bound to the conduct of the trial to permit second guess-ing from the appellate bench. We therefore reject the plaintiff's demand for additional costs.

The plaintiff also claims that she is entitled to additional interest on the jury verdict. She argues that the district court erred by calculating interest on the verdict from the date that the plaintiff's amended complaint was filed, rather than from the date the action accrued.

Colorado law specifies the method of calculating interest in personal injury judgments. It provides in part as follows:

> In all actions brought to recover damages for personal injuries ... it is lawful for the plaintiff in the complaint to claim interest on damages alleged from the date said suit is filed; and, on or after July 1, 1979, it is lawful for the plaintiff in the complaint to claim interest on the damages claimed from the date the action accrued .... On actions filed on or after July 1, 1979, the calculation shall include compounding of interest annually from the date such suit was filed.

Colo.Rev.Stat. § 13–21–101 (Supp.1982). The plaintiff filed her complaint on May 20, 1980. Thus, under the language of the statute, she was entitled to interest from May 21, 1979, the date the accident occurred and the cause of action accrued. However, the court did not apply the statute. Its decision apparently reflects retroactivity concerns. On the date of Mr. Meller's accident, the above-quoted provisions were not in effect; Colorado provided interest only from the date that the complaint was filed. *See* Colo.Rev.Stat. § 13–21–101 (1973). Colorado added the above-quoted provisions on June 20, 1979. *See* 1979 Colo.Sess.Laws chap. 55, § 3. The court apparently concluded that since the new provisions post-dated Mr. Meller's accident, application of the provisions to the plaintiff's case would violate retrospectivity proscriptions in the Colorado Constitution.

The Colorado Constitution provides that "no ... law ... retrospective in its operation ... shall be passed by the general assembly." Colo. Const. art. II, § 11. The Colorado Supreme Court has stated that a

law is retrospective if it "abrogates an existing right of action or defense, or creates a new obligation on transactions or considerations already past." *California Co. v. State*, 141 Colo. 288, 348 P.2d 382, 399 (1959) (quoting *Evans v. City of Denver*, 26 Colo. 193, 57 P. 696, 697 (1899)). It has explained that the purpose of the constitutional provision is "to prevent the unfairness entailed in altering the legal consequences of events or transactions after the fact." *Northern Natural Gas Co. v. Public Utilities Commission*, 197 Colo. 152, 590 P.2d 960, 962 (1979). The court has held, however, that the legislature may create new remedies for injury where none existed before. In *Jefferson County Department of Social Services v. D.A.G.*, 199 Colo. 315, 607 P.2d 1004 (1980), the court concluded that a child could bring a paternity action against a putative father under a statute passed after the child's birth. The court stated that "[t]he abolition of an old remedy, or the substitution of a new one ... constitutes [neither] the impairment of a vested right nor the imposition of a new duty; for there is no such thing as a vested right in remedies." 607 P.2d at 1006.[10]

The amendments to the Colorado interest statute increase the allowable damages to a prevailing plaintiff. They therefore constitute an alteration in the measure of a remedy. We believe that the Colorado Supreme Court would conclude, under the reasoning of *Jefferson*, that the application of these amendments to the instant case does not violate the constitutional ban on retroactive laws. The amendments do not impair a right vested in Heil; *Jefferson* makes clear that a defendant does not have a vested right in the application of a given remedial scheme. Furthermore, the amendments do not impose an additional duty on Heil; only the measure of damages that result from the violation of a duty has changed. We conclude that Colorado precedent indicates that Colo.Rev.Stat. 13–21–101 should be ap-

plied as presently written. The plaintiff is entitled to the full measure of interest specified in the statute.

### Conclusion

The judgment of the district court is affirmed with respect to all issues except the calculation of interest on the damage award. The case is remanded to the district court for addition of interest in the amount provided by Colo.Rev.Stat. § 13–21–101 (Supp.1982).

---

**10.** In *Jefferson,* the court did not discuss whether the new remedy imposes a new obligation on a past transaction. *See California Co.,* 348 P.2d at 399. The court apparently applies the "new

obligation" test only in cases involving contractual transactions. *See, e.g., Bonfils v. Public Util. Comm'n,* 67 Colo. 563, 189 P. 775 (1920).