Theodore L. **MANKEY** and Sherri Mankey, Plaintiffs–Appellees,

v.

Irma Kay **BENNETT**, Defendant–Appellant.

No. 92–2096.

United States Court of Appeals, Seventh Circuit.

Argued Dec. 6, 1993.

Decided Oct. 24, 1994.

Jeffrey L. Arnold, Donald K. McClellan (argued), Muncie, IN, for plaintiffs-appellees.

Thomas L. Wooding, Wilks & Kimbrough, P. Michael Miller (argued), Miller & Stewart, Fort Wayne, IN, for defendant-appellant.

Before KANNE and ROVNER, Circuit Judges, and CURTIN, District Judge.*

KANNE, Circuit Judge.

Theodore L. Mankey[1] was awarded $574,521 in damages resulting from permanent injury to his knees suffered in an automobile accident caused by Irma Kay Bennett. The jury in this diversity case heard evidence that Mankey, a manual laborer, was left unemployable after the accident because of his physical restrictions and lack of education. Part of the calculation for the damages included Mankey's life expectancy and future earning capacity. What the jury did not hear was that Mankey was also a long time alcohol and drug abuser. Bennett appeals only the damages portion of the verdict and claims that the district court erred, (1) in restricting discovery regarding Mankey's alcohol and drug abuse, (2) in refusing to allow the jury to hear an expert witness and evidence dealing with Mankey's alcohol and drug abuse, and (3) in failing to give her tendered instruction on plaintiff's duty to mitigate.

---

* The Honorable John T. Curtin, District Judge from the Western District of New York, sitting by designation.

1. Sherri Mankey, Theodore Mankey's wife, was a co-plaintiff and part of the damages award included recovery for loss of consortium. Throughout the opinion, however, "Mankey" refers only to the accident victim, Theodore Mankey.

## BACKGROUND

### Evidence Admitted

The evidence admitted at trial discloses the following. An automobile accident, which is the subject of this litigation, occurred on September 26, 1989, in the early morning hours on a country road in Indiana. Both parties were on their way to work at the same manufacturing plant, Strick Corporation. Bennett's car made a left-hand turn in front of Mankey's automobile. A collision occurred and Mankey received severe injuries to both knees. Surgery was required and braces were prescribed. Mankey, who was 35 years old at the time of the accident, was left with permanent physical impairment that will likely require subsequent surgery and prostheses.

Mankey had limited education, was virtually illiterate and had always held jobs involving manual labor. His doctors indicated that Mankey was able to perform some limited physical work following the surgical procedures and therapy, but not manual labor. However, a rehabilitation counselor found him to be totally unemployable, now and in the future, because of his physical restrictions and educational deficiencies.

Mankey had some work attendance and disciplinary problems during the seven or eight years he worked at Strick Corporation, but at no time prior to the accident was he in danger of losing his job. Company officials indicated that they would re-employ him but for his medical restrictions. Mankey also had a pre-existing back condition from a prior injury.

### Evidence Excluded

Evidence regarding Mankey's history of substance abuse was not admitted at trial. The excluded evidence concerned the following information contained in three separate sets of Mankey's mental health records from Park Center. The set of records from 1981 described Mankey as "a long time drug and alcohol abuser, including heroin 1½ years" who had received residential treatment for alcohol abuse at Richmond State Hospital in that year. Mankey's next set of records, for the year 1988, indicated that a work-related injury led to a urine test which showed positive for marijuana. These records describe Mankey as having a "history of dependence upon cannabis" and continuing cannabis dependence. Also described were symptoms of alcohol dependence and barbiturate abuse in remission. Finally, Mankey's last set of records from Park Center, dated 1991–92, recount in somewhat expanded detail his history of drug and alcohol abuse previously described in earlier charts. Also revealed in this set of records was continuing cocaine use which commenced in 1988.

## DISCUSSION

### Discovery Restrictions

█ This lawsuit was filed on September 19, 1991. In early October of 1991, there was a drug related incident which resulted in felony charges being brought against Mankey for criminal recklessness. On October 7, 1991, immediately following the incident, Mankey began counseling sessions at Park Center. Bennett's counsel learned on February 20, 1992, from medical records obtained from an examining physician, that Mankey had received counseling from Park Center in the latter part of 1991 and early 1992.

On March 2 or 3, 1992, in a telephone conference between counsel for the parties, Mankey's attorney indicated that no authorization for release of Park Center records would be given. The refusal arose out of a concern that a release could constitute a waiver of Mankey's Fifth Amendment privilege against self-incrimination because information in those records related to his pending criminal case. Counsel for both Bennett and Mankey then agreed that the only way to resolve the matter was to present it to the court.

A week later on March 10, 1992, Bennett's counsel, on behalf of both parties, filed a request for assistance in discovery. The motion states that "Mr. Mankey began to receive counseling at Park Center following the incident which gave rise to the criminal proceedings." The motion further states that Mankey's attorneys have refused to permit him to authorize Park Center to release its records to defendant because disclosure would waive his Fifth Amendment privileges

against self-incrimination in relation to the pending criminal case. In a separate memorandum, submitted on her own behalf, Bennett argued that either the court should order Mankey to execute the authorization (with protective provisions) or postpone the case until after completion of Mankey's criminal trial, set to begin on April 15, 1992.

At a hearing three days later on March 13, 1992, the court decided on an alternative method to facilitate the discovery of the Park Center records. Instead of directing Mankey to release the records to Bennett's counsel or granting a postponement of the trial, the court ordered the records to be submitted to it within five days for an *in camera* inspection. The court then denied Bennett's request for direct discovery and the trial postponement. Mankey also filed an addendum to a previously submitted motion *in limine* requesting the exclusion of any reference to Mankey's use of alcohol or illegal drugs.[2] The court set Mankey's additional paragraphs of his motion *in limine* for hearing on March 20, 1992.

Mankey submitted Park Center records for the court's inspection on March 17, 1992. The only records provided to the district court for an *in camera* inspection, however, were those for 1991–92 connected with the criminal recklessness incident. Within three days, following oral argument on March 20, 1992, the court found that the Park Center records submitted to it were relevant for discovery purposes. Then, consistent with Mankey's Fifth Amendment privilege (which it found to be validly exercised) the court redacted a few lines of the records and provided them to counsel for Bennett. Those 1991–92 records contained, among other relevant information, a detailed history of Mankey's drug use and addictions.

Bennett claims that her discovery efforts with regard to Mankey's substance abuse were unfairly hampered by the court. Although Bennett complains, in passing, that she was denied supplemental depositions of the Mankeys, the thrust of her argument

concerns her inability to obtain the Park Center records.

By at least February 7, 1992, counsel for Bennett was aware that Mankey had received counseling at some point at Park Center. The request to the court for assistance in obtaining the Park Center records came on March 10, 1992. Then, on March 20, 1992, ten days after it sought the court's assistance—and ten days prior to trial—the 1991–92 records outlining Mankey's drug and alcohol abuse history were in the hands of Bennett's counsel.

Given the circumstances of this case, the procedure employed by the court in dealing with the Fifth Amendment problem and providing access to the 1991–92 records was entirely appropriate. The court acted promptly and, as it was required to do, protected Mankey's Fifth Amendment rights in redacting the records.[3] There was no abuse of discretion in the court's handling of Bennett's discovery request. Furthermore, the district court did not abuse its discretion by denying Bennett a continuance of the trial, as the following section will discuss.

## Denying Additional Expert Witness and Excluding Substance Abuse Evidence

■ At the previously scheduled time, immediately prior to the commencement of trial on March 30, 1992, the court conducted a hearing pursuant to Rule 104(a) of the Federal Rules of Evidence. The purpose of the hearing was to make a preliminary determination regarding the admissibility of evidence concerning Mankey's alcohol and drug abuse. These were the matters sought to be excluded by Mankey's motion *in limine*.

As a part of the hearing, but with apparently no prior notice to the court, Bennett called Robert O. Young, Jr., to testify. Young, an addiction counselor with the Life Skills Treatment Center, testified that he had a bachelor's degree from Purdue University and had received special training in addictions from various programs. He also testified that he had worked for 13 years as a

---

2. Mankey's original motion *in limine* filed on January 27, 1992, sought exclusion of evidence relating to alcohol treatment at Richmond State Hospital.

3. Having reviewed the unredacted records we can say that the Fifth Amendment concern was valid and the information redacted was not relevant to this case.

probation officer for the Allen County Superior Court and developed an alcohol countermeasures program. With a total of 16 years experience in addiction counseling, Young stated that he had recently received certification as an addiction counselor, senior level, from the National Association of Alcohol and Drug Counselors.

Upon further questioning by Bennett's counsel, Young stated that he was able to make "general observations" about the effect of drugs and alcohol on a person's job performance, that person's ability to produce income over a lifetime and his life expectancy. Then, in response to hypothetical questions, Young gave a number of opinions regarding reduced life expectancy and reduced earning capacity based on alcohol and drug use.

Bennett then asserted, over Mankey's objection, that Young should be permitted to testify at trial as an expert witness with regard to Mankey's life expectancy and future work performance.

We need go no further than the following colloquy to crystalize the issue of whether Young, the addictions counselor, should have been permitted to give expert testimony.

> THE COURT: ... Mr. Young is not listed on the Pretrial Order, is he?

> MR. MILLER: No, Your Honor, he's not.

Indicating why the expert witness on this subject had not been previously declared, counsel for Bennett claimed before the trial court, as he does here, that he had discovered documentation of Mankey's pattern of drug and alcohol abuse only shortly before trial. Bennett's counsel stated to the magistrate judge that Young was "not listed because the Pretrial Order was already filed and the development[s] h[e]re did not take place until last week." The magistrate judge responded:

> It's a bit disingenuous to suggest that this issue of alcohol or substance abuse was not a red flag in this case, because that's all I've been hearing about for the last, well, ever since this thing was filed.

> And if the right questions have not been asked or the right witnesses have not been listed, it's not the fault of the Court, nor do I think that there has been any hide and seek being played here.

> The fundamental point of fact is that Mr. Young isn't on the Pretrial Order. . . .

The question, of course, is whether the need to obtain an additional expert witness first became apparent during the week of March 22nd—and more particularly, as counsel claims, on March 26th when he received the 1981 and 1988 Park Center records. Was that the point at which it was revealed for the first time that Mankey had a history of alcohol and drug problems potentially affecting his life expectancy and future earning capacity? Did the disclosure of the 1981 and 1988 Park Center records four days prior to trial require the court to exercise its discretion to excuse Bennett's failure to add an additional expert witness in compliance with the requirements of the pretrial order?

Consistent with Rule 16(e) of the Federal Rules of Civil Procedure, the pretrial order provided that "in the event there are other witnesses to be called at trial, their names and addresses and the general subject matter of their testimony will be reported to opposing counsel, with copy to the Court, at least ten (10) days prior to trial. Such witnesses may be called at trial only upon leave of Court."

Mankey's deposition was taken on December 19, 1991, and the "discovery obstacles presented by the criminal charges" pending against Mankey were discussed by counsel. Whether disclosure of Mankey's treatment at Park Center was made at that time is unknown, but in December Bennett became aware of Mankey's residential treatment for alcohol abuse at the Richmond State Hospital in 1981.

Following the deposition, Mankey's counsel filed a motion *in limine* on January 29, 1992, seeking to exclude any mention of Mankey's arrest for criminal recklessness and Mankey's treatment for alcoholism at Richmond State Hospital.

In a pretrial order entered at the preliminary pretrial conference on February 7, 1992, Bennett listed as an exhibit "plaintiff's records from Park Center" and, as a witness, the "Records Custodian, Park Center."

Thus, as we said earlier, by no later than February 7th, Bennett was aware that Mankey had received treatment at Park Center. In fact, the question of an authorization to Park Center for the release of Mankey's records was discussed by counsel on that date.

On February 11, 1992, Mankey signed an authorization for release of information from Park Center. It is unclear who prepared the document authorizing Park Center to "release and disclose to MILLER & STEWART, Attorneys at Law, 3rd Floor Paine Webber Building, 803 South Calhoun Street, Ft. Wayne, Indiana 46802, or their authorized agent all facts and information pertaining to me which you have in your possession. . . ." An interlineation was made in some unknown hand limiting the authorization to the 1981 and 1988 records. This is apparently the release that Bennett's counsel stated he received from Mankey's attorney on March 23, 1992. The 1981 and 1988 records were then secured from Park Center through that authorization on March 26th. It is unexplained why the authorization, signed by Mankey on February 11th, was not delivered to Bennett's counsel until March 23rd.

Nevertheless, the information regarding Mankey's drug and alcohol abuse contained in the 1981 and 1988 records was recounted in some detail in the 1991–92 records provided to Bennett's attorney on March 20th. Thus by March 20th, Bennett obviously had sufficient information to develop the strategy disclosed in her trial brief filed during the final pretrial conference on March 23, 1992. The brief indicated "defendant may introduce evidence of plaintiff's drug/alcohol use, since it is relevant both to the mortality table evidence, and to the alleged issue of loss of earning capacity." Bennett's trial brief also argued that plaintiff's "injury" was his "claimed loss of earning capacity, and the causes and duration thereof." The brief concluded, therefore, that "defendant can introduce evidence from plaintiff's medical/mental treatment at Park Center."

The strategy of using Mankey's alcohol and drug abuse to show decreased life expectancy and earning capacity thus surfaced one week prior to trial. Bennett's trial brief was accompanied by an expanded list of exhibits as an amendment to the pretrial order; the list included Park Center records for 1981, 1988 and 1991–92. However, there was no request to amend the witness list in the pretrial order to add an additional expert witness to give testimony in support of this strategy.

It was not until the day of trial that Bennett asked to call an expert witness to testify concerning the issue of life expectancy and future work performance as they might be impacted by drug or alcohol abuse.

Because Bennett's expert witness was prohibited from testifying, the court ruled that the drug use evidence, standing alone, was inadmissible. Thus the court granted Mankey's motion *in limine*. Thereupon the following colloquy took place:

MR. MILLER: For the record, Your Honor, based on the Court's ruling and in view of the time problems that were created in the past, the Defendant respectfully requests that the trial of this case be continued.

THE COURT: Well, I don't know what that means, but what time constraints are—have somehow been elicited, but I've got a jury out there. This thing has gone through pretrial, we had a pretrial last week or a little over a week ago, just had a 104(a) hearing, and I'm ready to go. And if somebody else is not because they didn't ask the right questions to somebody or didn't bring the right witness to trial, that's—we're not going to give them an opportunity to cure it now, because I don't think that's within the contemplation of the Rules of Court.

What we are here to do is try the case, based on each side's operation. This issue has been in this case for months and I think we're now down to getting it tried. And Mr. Mankey, certainly, and Ms. Mankey are entitled to have their day in Court. They waited some period of time to have that done and I'm here to try the case.

And on the basis of your motion is not sufficient for the granting of a continuance. We'll show it denied.

When, along the continuum from the entry of the pre-trial order until the date of trial, should Bennett reasonably have been required to give notice of her intent to add the addictions expert to her witness list in order to be entitled to call that witness at trial? That determination was a judgment call for the trial court subject to the abuse of discretion standard. *American Int'l Trading Corp. v. Petroleos Mexicanos,* 835 F.2d 536, 538–39 (5th Cir.1987); *Spray–Rite Serv. Corp. v. Monsanto Co.,* 684 F.2d 1226, 1245–46 (7th Cir.1982), *aff'd on other grounds,* 465 U.S. 752, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984).

The answer, of course, depends on when Bennett knew or should have known that Mankey had a history of drug and alcohol abuse which would have suggested a reduction in life expectancy and earning capacity, and how soon an appropriate expert could be located and prepared for trial. *American Int'l Trading Corp.,* 835 F.2d at 539; *Keyes v. Lauga,* 635 F.2d 330, 335 (5th Cir.1981).

It seems clear that the district court determined that Bennett should have known of the need to call a substance abuse expert much earlier in the case than four days prior to trial. As the court stated, the issue of substance abuse and its impact on Mankey's life expectancy and earning capacity had been a "red flag" for some time. It cannot be said for certain when the "red flag" actually went up.

There is no dispute, however, that Bennett obtained the critical Park Center records of 1991–92 on March 20th. From that date Bennett clearly had sufficient information to develop the theory ultimately advanced and to recognize the need for an expert witness. The record does disclose that by at least seven days prior to trial, Bennett had formulated the reduction of life expectancy and earning capacity strategy based on substance abuse. This theory was set out in her trial brief.

Therefore, did Bennett act unreasonably in waiting from March 20th until the day of trial on March 30th to give notice of her intent to call the addictions expert? The tenor and nature of the court's ruling indicates that it considered the surprise and prejudice which would be visited upon Mankey if Bennett's unlisted expert witness had been allowed to testify, but it focused primarily on the effect a waiver of the rule against calling unlisted witnesses would have upon the orderly progress of the trial. *See Spray–Rite Serv. Corp.,* 684 F.2d at 1245. Mankey would not have been able to go forward without some time to prepare to meet the testimony to be presented by Bennett's unlisted expert. Thus the necessity for a continuance of the trial would have been based on Bennett's delay in seeking to include an unlisted witness.

Rule 16(e) requires the modification of a pretrial order only to prevent manifest injustice. While in light of the time constraints we might have handled this trial management problem in a different manner, the issue is whether manifest injustice was done to Bennett. Had Bennett alerted the court to the necessity of adding an expert witness (even unnamed) on March 23rd when she amended her list of exhibits relating to Park Center, a different result might be warranted. But why counsel waited from March 20th until, as he described it, the "twelfth hour," to ask for the addition of an expert witness was never explained to the trial court. It could be that finding and preparing an expert witness to testify after March 20th was the heart of the problem, but that argument was never advanced to the district court. Bennett has not demonstrated manifest injustice and we cannot say that the district court abused its discretion in refusing to permit the unlisted addictions counselor to testify at trial.[4]

---

4. The court also gave a secondary reason for excluding the testimony of Bennett's expert witness finding that, while Young may have qualified as an expert on addiction counseling, he had neither the medical background nor occupational training to qualify him as an expert in the areas of life expectancy and future job performance. That may or may not be the case, but we need not reach that issue having determined that the failure to properly add him to the list of witnesses was fatal.

The trial court then turned to Mankey's motion *in limine* to exclude all evidence of alcohol and drug use. The court determined that, without an expert to analyze Mankey's history of substance abuse as it would relate to his life expectancy and future earning capacity, the admission of such evidence would be merely prejudicial and (standing alone) of no probative value.

We agree that the only rationale for admitting the evidence was to enable the expert witness to offer an opinion about how Mankey's drug and alcohol abuse would affect his life expectancy and future earning capacity. With no expert to lay a foundation and tie the substance abuse to an impact on Mankey's life expectancy and ability to earn an income, such evidence was not admissible. *Meller v. Heil Co.,* 745 F.2d 1297, 1303 (10th Cir.1984). Under these circumstances, any probative value of that substance abuse evidence was substantially outweighed by the danger of unfair prejudice. *See* Fed.R.Evid. 403.

The court did not err in granting Mankey's motion *in limine* and refusing the admission of any evidence related to Mankey's alcohol and drug use.

### Refusal to Give Tendered Instruction

Bennett tendered Instruction No. 2 which read in its entirety as follows:

#### INSTRUCTION NO. 2

Federal Jury Practice and Instructions—4th Edition [5]

§ 72.08—Opinion Evidence—Expert Witness

§ 85.13—Damages—Duty to Mitigate

§ 85.14—Damages—Reasonable—Not Speculative

§ 85.15—Damages—Must Have Been Proximately Caused

*S/P. Michael Miller*

P. Michael Miller
Attorney for Defendant

An instruction conference was commenced shortly after the conclusion of the evidence.

The court had previously provided counsel with the first 22 of its proposed final instructions. The conference primarily consisted of resolving the balance of the court's final instructions. In that process, part of Bennett's tendered Instruction No. 2, pattern jury instructions 85.14 (Damages–Reasonable–Not Speculative) and 85.15 (Damages—Must Have Been Proximately Caused) were initially discussed. The court determined that they were covered by other instructions which were to be given.

Near the end of the instruction conference the court asked: "Mr. Miller, (counsel for Bennett) [are] there any instructions that ought to be included and aren't?" Counsel responded with a request to modify the court's instructions regarding life expectancy. As a result, the court included the modified version of pattern instruction 85.10 (Life Expectancy—Table of Mortality) in the court's life expectancy instruction. Bennett's counsel then indicated, "I have one other, Judge." He made reference to expert witnesses, apparently referring to pattern jury instruction 72.08 (Opinion Evidence—Expert Witness) which constituted another part of Bennett's tendered Instruction No. 2. Upon review, counsel for Bennett then agreed that one of the court's instructions already covered that issue.

Finally, again addressing Bennett's counsel, the following colloquy occurred:

THE COURT: Well, do we have any other instructions that you're suggesting are missing?

MR. MILLER: No.

Thereafter, in concluding the instruction conference the following discussion took place:

THE COURT: ... *[because] I think you've stated what it is you are going to object to*—I'd like to have you stipulate and agree that you'll make your objections to the jury instructions after all the final arguments, after the jury retires to deliberate; so we don't hold them up. Is that agreed? (emphasis added).

MR. McCLELLAN: Fine. That's agreed.

THE COURT: Agreed, Mr. Miller?

MR. MILLER: Yes, sir.

---

**5.** Devitt, Blackmar and Wolff, *Federal Jury Prac-* *tice and Instructions* (4th Ed.1987).

■ Rule 51 of the Federal Rules of Civil Procedure provides in part that "no party may assign as error ... the failure to give an instruction unless that party objects thereto before the jury retires to consider its verdict...." Here, however, because the court assumed that during the instruction conference, counsel had already "stated what it is you are going to object to," it solicited a stipulation to waive the Rule 51 requirement that objections be made prior to deliberation. What followed focuses on the problem with such a procedure.

The next morning the jury heard final argument and retired to deliberate. After the jury began their deliberations counsel made their record on the jury instructions. Mr. Miller, counsel for Bennett indicated two objections for the record, including the following:

> The defendant further objects to the court's refusal to give the defendant's tender[ed] instruction # 2, *specifically instructions on damages duty to mitigate under section 85.13 of federal jury practice and instructions* for (inaudible). For reason that; [first] the instruction is a correct statement of law; secondly, there are facts in the case which justified the giving of instruction on the plaintiff's duty to mitigate; and third, that the substance of the instruction was not covered by any other instruction given by the court. And there's no further objections.

(Emphasis added). During the entire instruction conference there had been no specific mention of Bennett's tendered Instruction No. 2 nor any reference at all to an instruction regarding a duty to mitigate. In fact, when directly asked twice by the court if there were any instructions Bennett desired to be given that the court had failed to include in its proposed final charge to the jury, Bennett's counsel mentioned for consideration three parts of her tendered Instruction No. 2 dealing with expert witnesses (72.08), speculation regarding damages (85.14), and proximate cause of damages (85.15), yet quite plainly omitted any reference to any instruction on a duty to mitigate (85.13). The court was never made aware, prior to giving the final instructions to the jury, that Bennett objected to the court's omitting an instruction on a defendant's duty to mitigate. The issue was never a topic of discussion during the instruction conference.

It is questionable whether the procedure of delaying the Rule 51 objections to instructions until after jury deliberations had begun allowed Bennett to preserve for our review the court's failure to give the "duty to mitigate" instruction. The court, in invoking the procedure, assumed, and was not advised otherwise, that the objections to be made "for the record" would be the same objections made during the instruction conference. However, in light of the court's active solicitation of counsel's stipulation, we will honor counsel's agreed waiver of Rule 51's timing requirement, and treat Bennett's objection as if it had come prior to the jury retiring.

■ Nevertheless, another part of Rule 51 comes into play which requires the party making the objection to state distinctly "the grounds for the objection." As we have held, it is not sufficient to merely inform the court of an objection to a failure to give a tendered instruction. This court said in *Guerts v. Barth*, 892 F.2d 622, 624 (7th Cir.1989), "[t]o preserve for appeal the ... failure to give a jury instruction, the grounds of the objection must be stated with enough specificity so that the trial judge is adequately appraised of the legal or factual basis for the objection." In making her formal objection to the court's failure to give the mitigation instruction (85.13), the grounds given in support of the objection were merely that "the instruction is a correct statement of the law ... there are facts in the case which justified the giving of instruction on the plaintiff's duty to mitigate; and ... that the substance of the instruction was not covered by any other instruction given by the court."

Yet assuming (as we have done) that the objection was made in conformance with the timing requirements of Rule 51, the grounds stated are wholly inadequate to preserve the matter for appeal. The stated "grounds" for the objection give not a clue as to the legal or factual basis for the instruction which Bennett advances on appeal—that the "injury" to be mitigated was Mankey's economic loss and the adverse impact of alcohol and drug

abuse on that loss. While in some instances the basis for an objection may be obvious to the court from the context of specific facts and law, that is not the case here. Bennett's failure to state the grounds for objection with any specificity could not adequately apprise the court of the basis for the objection. Bennett did not preserve the issue of the court's failure to give her tendered "duty to mitigate" instruction for our review on appeal.

■ Even if the issue were not waived, however, Bennett could not prevail. The pattern instruction tendered (by reference) reads as follows:

§ 85.13 Damages—Duty to Mitigate

It is the duty of any person who has been injured to use reasonable diligence and reasonable means under the circumstances, in order to prevent the aggravation of such injuries and to effect a recovery from such injuries.

In the context of the case presented to the jury, it is difficult to see how the wording of this instruction could relate to more than Mankey's physical injuries. Even the citations that deal with personal injury cases which follow the pattern instruction [6] focus on such issues as refusal to submit to reasonable surgery. The language of the tendered pattern instruction, without modification or explanation, could not rationally be considered by a jury to relate to anything but a duty to "prevent the aggravation of" and "effect a recovery from" physical injuries.

The tendered instruction, of course, was a correct statement of the law with regard to mitigation of physical injuries. But there was no medical evidence in this case which would indicate that Mankey aggravated his physical injuries or impaired his physical recovery. In fact, there was medical evidence to the contrary that Mankey had done everything possible to effectuate his physical recovery.

It is error, under Indiana law, to fail to give a tendered instruction when: (1) the instruction correctly states the law, (2) the instruction is supported by the evidence, (3)

the substance of the instruction is not covered by others which were given, and (4) that there is a reasonable probability that substantial rights of the complaining party have been adversely affected. *Sullivan v. Fairmont Homes, Inc.*, 543 N.E.2d 1130, 1140 (Ind.Ct.App.1989). In this case, we need only to look to point two. The tendered instruction is not supported by the evidence. Thus, even if the issue had been preserved for our review, there would have been no error in not giving Bennett's tendered instruction on mitigation.

The judgment of the district court is AFFIRMED.

---

**6.** Notes, Devitt, Blackmar and Wolff, *Federal Jury Practice and Instructions* at 336–38 (4th Ed.1987).