**SEARS ROEBUCK AND CO.,**
**Appellant–Defendant,**

v.

**Milan MANUILOV, Appellee–Plaintiff.**

No. 73A01–9805–CV–193.

Court of Appeals of Indiana.

Sept. 8, 1999.

Donald D. Levenhagen, Rori L. Goldman, Hill Fulwider McDowell Funk & Matthews Professional Corporation, Indianapolis, Indiana, Attorneys for Appellant.

W. Scott Montross, John F. Townsend, III, Townsend & Montross, Indianapolis, Indiana, Attorneys for Appellee.

## OPINION

BROOK, Judge

### Case Summary

Appellant-defendant Sears, Roebuck and Co. ("Sears") appeals the trial court's judgment of $1,400,000 in favor of appellee-plaintiff Milan Manuilov ("Manuilov") for his personal injury negligence claim. We reverse and remand for a new trial.

### Issues

Sears raises three issues for review, which we restate as follows:

(1) whether the trial court erred in excluding Manuilov's testimony regarding alleged acts of domestic violence that Sears intended to use to rebut the testimony of an expert witness and to impeach Manuilov's credibility;

(2) whether the trial court erred in admitting the opinions of Dr. Jeffrey B. Quillen ("Quillen") and Dr. Martin Blinder ("Blinder") as Manuilov's expert scientific witnesses; and

(3) whether the judgment was excessive as a matter of law.

## Facts and Procedural History

The facts most favorable to the judgment indicate that on January 27, 1988, Manuilov tripped and fell over a vacuum cleaner hose at a Sears store in Richmond, Indiana. He hit the back of his head on the concrete floor. An ambulance took Manuilov to Reid Memorial Hospital, where he was diagnosed by Quillen with a head contusion and released the same day. Manuilov returned to the hospital three days later, complaining of persistent dizziness and occasional severe headaches; he was examined by Dr. Reagan, who recorded a diagnosis of post-concussion dizziness. Manuilov's headaches and dizziness persisted, for which he sought treatment from several doctors in the United States and in his native Bulgaria.

On January 25, 1990, Manuilov and his wife and daughter filed a complaint for damages in the Wayne County Superior Court, alleging that Sears' negligence had proximately caused him to sustain "permanent and severe personal injuries" that resulted in the permanent impairment of his "ability to work and earn a living" as a high-wire circus performer. They also sought compensation for his wife's loss of consortium, his daughter's loss of his services, and his wife and daughter's "permanently impaired" ability to "work and earn a living" as members of his performing group.[1]

A jury was unable to reach a unanimous verdict after a trial in March 1997, and a mistrial was ordered. The case was then venued to Shelby County Circuit Court.

On August 15, 1997, Sears filed a motion in limine requesting that the trial court order Manuilov not to present any information concerning his "having a diagnosis of and suffering from post-concussion syndrome";[2] his "having sustained a permanent physical injury to his brain"; and his "symptoms of headaches and dizziness being caused by an organic physical defect sustained as a result of the alleged fall in question." In its supporting brief, Sears argued that the prejudicial value of this evidence would greatly outweigh its minimal probative value under Ind. Evidence Rule 403; Sears also argued that the opinions offered by Manuilov's expert witnesses should be excluded because the experts were not sufficiently qualified to testify about these issues and their opinions were not scientifically reliable under Ind. Evidence Rules 702 and 703.

Manuilov filed a brief in reply to Sears' motion on September 12, 1997, claiming that his expert witnesses were indeed qualified to testify about these issues and that their opinions were based on sufficiently reliable scientific principles. The trial court held a hearing on Sears' motion in limine on September 30, 1997, and denied the motion on October 14, 1997. There is no transcript of the hearing in the appellate record. The parties' arguments with respect to the qualifications of Manuilov's expert witnesses and the scientific reliability of their opinions surfaced repeatedly at trial and will be explored in greater detail below.

A second trial was held on October 20–24, 1997. On October 21, 1997, during Manuilov's direct examination of Quillen, a specialist in emergency and trauma medicine and the physician who first examined Manuilov on his admission to the emergency room, the issue of post-concussion syndrome was raised during the following exchange:

---

1. Manuilov and his wife were divorced in 1992; the claims of his wife and daughter were dismissed by the Wayne Superior Court on March 4, 1997, leaving Manuilov as the sole plaintiff in this case.

2. Also referred to as "post-concussive syndrome" or "postconcussional disorder."

[MANUILOV'S COUNSEL]: Doctor, I would like for you to assume, obviously you were not here when Mr. Manuilov was testifying this morning, but I would like for you to assume that he has testified, as I'll represent to you he indeed has, that uh . . . now in October of 1997 he continues to have headaches and dizziness uh . . . on a repeated basis and has had those symptoms and suffered from those conditions since January 27th, 1988. Given that information, doctor, I'd like to ask you if uh . . . there are tests you could run, if you were to come over here and . . . and examine Mr. Manuilov right this moment, are there tests that you could run, doctor, that would enable you to identify or to see headaches or dizziness in Mr. Manuilov?

[QUILLEN]: No. It'd be very very unlikely.

[MANUILOV'S COUNSEL]: And why is that?

[QUILLEN]: Simply because concussive syndrome or post-concussive syndrome is uh . . . a . . . It's not that it . . . it's not an organic disease, but it tends to present itself with the symptoms that the patient presents with or feels, as opposed to something uh . . . where a person can run a test and say, ah, yes, here it is. Same way . . . Let me give you a comparison. A person can come in with chest pain and we would run an EKG or a heart tracing and it may come out normal. Now that doesn't mean the patient's not having chest pain or he's not having a heart attack, it just means that we can't see it on the EKG. And it's very similar . . . many of these tests that would likely to have been run on Mr. Manuilov uh . . . don't give a specific reading that would . . . you could hang a uh . . . organic basis or a medical diagnosis based on the results of a test only. You have to go with the whole picture, and for that reason it would be very unlikely that I

could run a test at this point that would show something. It would [not][3] be so black and white as, yeah, look here, that's the reason that . . . that we're having continued symptoms.

Sears then objected to Quillen's reference to post-concussion syndrome as follows:

Your Honor . . . Your Honor, excuse me, I'm sorry. I need to interpose an objection to preserve my record here. I object to the reference . . . the doctor's reference to post-concussion syndrome for all the reasons expressed in my pre-trial motion [in limine] which the Court has reviewed and [ask] that that testimony be stricken.

The trial court overruled Sears' objection but noted its request for a continuing objection with respect to Quillen's testimony on the issue of post-concussion syndrome. Manuilov's counsel later asked Quillen if he had an opinion "based upon a reasonable degree of medical certainty" whether Manuilov suffered from post-concussion syndrome:

[QUILLEN]: Well, the fact that it has been this prolonged and the symptoms certainly fit in the category of post-concussive symptoms, I . . . there's no question in my mind that . . . that he has symptoms related to post-concussive syndrome.

[SEARS' COUNSEL]: Excuse . . . excuse me, Your Honor. The question counsel asked was simply whether he had an opinion and then he went into giving an opinion, therefore, I move to strike the answer and request permission of the Court to pursuant to [Ind. Evidence Rule 104(a)] to conduct a preliminary examination as to the scientifical liability [*sic*] of that . . . of that opinion.

The trial court granted Sears' request to ask Quillen preliminary questions pursuant to Evid. R. 104(a) outside the presence of the jury.[4] In his responses to the questions,

---

3. The word "not" does not appear in the original transcript; however, the context of Quillen's testimony clearly shows that a diagnostic test would *not* definitively show the cause of a patient's symptoms indicative of post-concussion syndrome.

4. Evid. R. 104(a) reads in relevant part: "Preliminary questions concerning the qualification of a

person to be a witness, the existence of a privilege, or the admissibility of evidence shall be determined by the Court, subject to the provisions of subdivision (b)," which reads, "When the relevancy of evidence depends upon the fulfillment of a condition of fact, the Court shall admit it upon, or subject to, the introduction of evidence sufficient to support a finding of the fulfillment of the condition." A hearing held

Quillen drew a distinction between (1) a medical *diagnosis,* which he would render only after studying a person's "past medical history, social history, physical exam, lab testing, etc." or performing an examination "very closely and firsthandly [*sic* ]"; and (2) a medical *opinion,* which he would offer in the absence of "firsthand information." Quillen admitted that he had not examined Manuilov since the day of the fall; that he had based his medical *opinion* that Manuilov suffered from post-concussion syndrome on "some secondhand information . . . . about what Mr. Manuilov's symptoms are," instead of making a diagnosis after a firsthand medical examination; that "headaches and dizziness can have a lot of different causes in medicine," such as a migraine headache; and that a person can experience headaches and dizziness without suffering a blow to the head. At the conclusion of the preliminary questions, Sears' counsel made the following objection:

> Number one, we object that the witness' testimony on this point is not helpful or relevant under [Ind. Evidence Rule 702(a)], uh . . . that he's been provided insufficient facts for a reliable opinion and, thus, the opinion's speculation. Unsupported expert opinion prohibited by case law interpreting Rule 702. Uh . . . and that the opinion is not based on information cust . . . customarily relied upon by uh . . . persons in this doctor's practice. That's [Evid. R. 703]. And, finally, uh . . . my final basis is that the uh . . . whatever minimal probative value this testimony has is outweighed by the prejudicial effect of reliance on the expert's stature rather than the . . . the scientific soundness of the opinion. That's [Evid. R. 403].

The trial court overruled Sears' objections, and Quillen was permitted to testify about post-concussion syndrome and to give his medical opinion that Manuilov suffered from this syndrome; he further opined without objection from Sears that the cause of Man-

uilov's symptoms was the blow to the head he had received from his fall in the Sears store. During cross-examination, Quillen agreed that his opinion was based on his "medical education, background, training, credentials and experience, the medical records associated with the Reid Hospital treatment . . . the information [he had been] supplied concerning Mr. Manuilov's condition at the scene of the accident and Mr. Manuilov's testimony concerning his present symptoms"; he also acknowledged that he had not seen any records indicating any "actual organic physical damage" to Manuilov's brain. Finally, Quillen acknowledged that he was "unaware of any information that medical science has been able to determine why Mr. Manuilov" had the symptoms of which he complained.

Blinder, a psychiatrist, was also called as an expert scientific witness by Manuilov on October 22, 1997. During direct examination, Blinder explained the term "post-concussion syndrome" to the jury:

> Uh, it's hard to do much damage to the skull, but, impact to the skull can be transmitted to the soft tissue within. And when that happens, if the brain receives a shock, that is if the skull gets a blow and transmits the trauma of that blow to the brain, causing a shock, we say the brain has been concussed. And, if you're lucky, when you get a concussion, you're dazed or you may be knocked out a little bit, and, over the next few weeks you don't feel quite right. You have a lot of headaches, you're dizzy, irritable, you may get depressed, it's difficult concentrating, memory, in particularly [*sic* ] memory of things that you just did twenty (20) minutes ago, seem[s] impaired. But, for most people, these fade away in time. If you're not lucky, then you have persistent symptoms. You're never quite back on your feet in the way you were. There's always a little slowing of the thought processes, some memory difficulty, some dizziness, and persistent headaches you never had before. There may be an

pursuant to Evid. R. 104(a) to evaluate the qualifications of an expert scientific witness and the reliability of the scientific principles in issue under Evid. R. 702 may also be referred to as a *Daubert* hearing, the significance of which will be more fully explained below. *See, e.g., Smith v.*

*Ford Motor Company,* 908 F.Supp. 590, 594, n. 5 (N.D.Ind.1995) (trial court held *Daubert* hearing and concluded that expert witness could testify as to "origin and cause" of pickup truck fire, "but could not testify as to the adequacy of the design" of the truck).

enduring personality change. Uh, these people seem to be more prone to anxiety. They're more prone to depression. Uh, their energy levels are diminished. They lose some of their motivation, their judgment. Their sexual energy seems to fade away. They have problems with their ... their coworkers and their family because their personality has changed, and usually not for the better. Uh, they have particular difficulty learning new material, although, they may be able to do old tasks pretty close to their previous levels of function. Because these symptoms persist for weeks, months, sometimes for years, after the concussion, we call this post-concussion syndrome. Syndrome refers to a constellation of symptoms. Post means after. You can have pre and you can have post. So if you have these symptoms and they endure for any length of time after the blow to the brain, you have a post-concussion syndrome....

But, it's interesting, it is very difficult to document this particular mental injury with the sort of diagnostic tools we have that are very useful in most other kinds of head injuries. Because a concussion is very subtle. It doesn't kill the cells. It shocks them. It stuns them. And we don't have fine enough tools to pick up that.

Blinder performed psychiatric assessments of Manuilov in July 1991 and in June 1995, after reviewing medical records given to him by Manuilov's attorney. When asked whether he had arrived at a diagnosis after the first assessment, Blinder answered as follows:

> Surely. I believe that he was suffering from an anxiety disorder with panic attacks. I believe that he was suffering from dysthymia, which is chronic and persistent low grade depression. I felt that, uh, many of these symptoms, in particular, dizziness and headaches, were consistent with post-concussion syndrome.

Sears objected to Blinder's answer and moved to strike his reference to post-concussion syndrome "for all the reasons that we

objected to Dr. Quillen and for all the reasons that we expressed in our pre-trial motion on that subject.... And we'd show a continuing objection on that point." The trial court overruled Sears' objection, and Blinder went on to state that his diagnosis of Manuilov after the June 1995 assessment was essentially the same as his earlier diagnosis.

In response to a question from Manuilov's counsel regarding the potential for persons to misrepresent their symptoms in cases with "subjective disabilities and symptoms that seem great compared to the injury that was suffered," Blinder's answer included the following:

> So that's ... sign number one, the malinger[er's] symptoms don't well fit an established clinical pattern. Number two, the degree of dishonestly [sic], sociopathy necessary to conjure up a legal lawsuit, a fraudulent lawsuit, is usually apparent in these people's lives in other areas. Uh, they're wife beaters. They desert their children. They're drunkards. Uh, they, uh, bounce from job to job to job. Uh, they often have, uh, criminal records, sometimes in some proportions, but at least a minor criminal record, four (4) or five (5) DUI's. And you can see that they're slippery critters long before they ever get the idea, ah, I'm gonna make some money in this lawsuit. Thirdly, and this is particularly the case in head injury situations, they flunk all the tests.... So, uh, certainly I ... I'm not, uh, I'm not omnipotent [sic] in these matters, but I am satisfied, more than satisfied, that Mr. Manuilov has a genuine disability and that he is not a malingerer.[5]

Blinder agreed with Manuilov's counsel's suggestion that his opinion regarding malingering had "been to a reasonable degree of medical and psychiatric certainty."

Blinder further testified regarding Manuilov's prognosis that "even with optimum treatment, uh, we could, uh, insure that he could safely cross the high wire ninety-six (96), ninety-seven (97), out of a hundred (100) times." Sears objected to and moved to

---

5. On cross-examination, Blinder stated that he had discovered no "criminal history or anti-so-

cial behavior" in Manuilov's background, having "specifically asked" Manuilov and his attorney.

strike this answer, claiming that Manuilov had failed to lay a proper foundation for it and that it was a lay opinion instead of an expert opinion. The trial court sustained Sears' objection, but when Manuilov asked Blinder whether he understood "the [principles] involved in high wire performing, generally," the following colloquy occurred after Sears made another objection:

[SEARS' COUNSEL]: My response to that, your honor, is just because no one is qualified, or, according to counsel's argument, there's no one qualified, uh, to be an expert on the vocational aspects of high wire, is not justification for allowing someone who's unqualified and for which a foundation of knowledge has not been laid to give these expert opinions.

COURT: I think he's testified that, uh, ninety-six (96) to ninety-seven (97) times out of a hundred (100), uh, the plaintiff would have no problems or be able to do that, but he couldn't assure that there would be a hundred (100) times. So, I'll allow that and we'll move on.

[MANUILOV'S COUNSEL]: Okay.

[SEARS' COUNSEL]: Is the objection overruled, your honor?

COURT: No, the objection is sustained. I'll let that ... there was no objection to that question.

With respect to the issue of causation, Manuilov's counsel asked the following question at the close of direct examination:

And, Doctor, uh, just ... just to wrap up, uh, uh, you use the term amalgam, uh, and, uh, uh, with regard to the various symptoms and conditions of ... I would simply ask you, in your opinion, to a reasonable degree of, uh, medical and psychiatric certainty and/or probability as to whether or not the causal connection, in your opinion, exists between the fall of January 27, 1988, the diagnosis of post-concussion syndrome, the diagnoses you have set forth with regard to his psychiatric condition and connecting those with your conclusions with regard to Mr. Manuilov's prognosis....

Without objection from Sears, Blinder answered, "Yes. I think they are all causally related."

During cross-examination, Blinder agreed with Sears' statement that "it would be improper for anyone to say that [Manuilov's] medical records prove that [he] has a physical injury in his brain." Sears also revisited its objection to Blinder's testimony regarding Manuilov's possible success rate on the high wire and asked the trial court to exclude the testimony pursuant to Ind. Evidence Rule 702(b); the trial court duly noted Sears' comments for the record but did not reverse its earlier ruling to admit Blinder's testimony.

When Blinder was asked on re-direct to state his opinion whether Manuilov suffered brain damage as a result of his fall, Sears objected that Blinder was not qualified to answer this question; Sears noted that Blinder had stated earlier that he "must leave the question of a possible organic contributive to Mr. Manuilov's complaints of dizziness to [his] colleagues in physical medicine." The trial court ruled that Blinder would have to testify consistently with this opinion. Soon thereafter, Blinder stated,

With those qualifications, it is my opinion, to a reasonable degree of medical probability, based on the available evidence for all of its limitations, that this man took a hell of a hit to the head. That this hit to the head has disabled him for reasons that are combined, both physical and psychological factors. Uh, that there is some room for improvement down the road, uh, but that he will have a substantial disability, and that disability impacts upon his personal life and upon his capacity to return to his previous profession.

Sears moved to strike this testimony, arguing that Blinder had speculated that there was a physical component to Manuilov's symptoms without laying a proper foundation for his opinion; the trial court denied Sears' motion.

After Manuilov rested his case, Sears attempted to call him and his girlfriend Helen Kurihara ("Kurihara") as witnesses on October 23, 1997. In a discussion outside the presence of the jury, Manuilov's counsel requested an *in camera* session to determine the nature of Sears' potentially "extremely prejudicial" questions. Sears' counsel replied that he had received information via fax

the previous day [6] that concerned "Blinder's opinion on malingering and the grounds for that opinion." The trial court ordered Manuilov and Kurihara out of the courtroom. After viewing the faxed documents and considering arguments from both parties, the trial court suggested that Sears make an offer to prove: "That's the only way I know to go about it because the nature of the evidence is such that uh ... it would ... it could certainly be highly prejudicial and inflammatory and that might, in and of itself, outweigh any benefit to the Jury to determine any of the issues that ... that the Jury will decide."

Trial counsel then made the following arguments:

[MANUILOV'S COUNSEL]: Judge, if I may make an observation. Obviously, I don't know what's there, but ... but it ... I think the Court has hit the key issue here which is whether or not the prejudicial impact of something that is obvious ... this is obviously prejudicial. Mr. Levenhagen [Sears' counsel] seems to be pulling one element from the malingering definition and I think Mr. Levenhagen just said there are thirty (30) things or something. Whether the prejudicial impact outweighs any probative value uh ... when put in front of the Jury that can poison uh ... the merits of this case.

[SEARS' COUNSEL]: And, Judge, my response to that is there's two kinds of prejudice. Unfair prejudice, that is, it ... it leads to confusion and giving the evidence more weight than it deserves, and there's the other part of prejudice, which is

the fact that it's true and just hurts their case. Judge, I think I've showed you that I've got a good faith basis for the question, that the facts are true and ·that uh ... while that the only unfair prejudice that's going to result here, Judge, is because Mr. Manuilov has not been truthful with his lawyer or with Dr. Blinder. And it's not my fault that he hasn't told his lawyer this.

THE COURT: Well, I still think under the circumstances that at least an offer to prove outside the presence of the Jury is appropriate so that I can determine, or at least try to determine whether or not the prejudice outweighs the relevance and ... and the assistance to the Jury to determine any fact [in] issue.

Referring to the faxed documents from Clark County, Nevada (without seeking to admit them into evidence),[7] Sears asked Manuilov whether he had "violently attacked and beat" Kurihara on December 13, 1995; whether he had hit her "in the face or head"; whether he had also "pushed and shoved" her or pulled her hair; whether he had been arrested and put in jail; whether he had called and threatened to kill Kurihara after he had been put in jail; and whether he had "beat her up" on at least one prior occasion.[8] Manuilov's counsel then made the following statement:

Excuse me ... excuse me. Your Honor ... Your Honor, I have an idea here. Instead of him being questioned about all of this, he's obviously reading from some court documents. I'm willing to stipulate into the record, for the purpose of this offer to prove, whatever is in those docu-

---

6. Manuilov refers to Sears' motion to correct errors, which states that Sears received the faxed documents on the second day of trial (October 21), to buttress its assertion that Sears received them the day before Blinder testified (October 22). However, when Sears' counsel presented the documents to the trial court on October 23, he stated that he had received them on the previous day and directed the court's attention to the "time and date stamped on the fax"; for whatever reason, the documents contained in the record do not bear any time or date stamp. Because the trial court did not openly contradict Sears' counsel's version of events, we can only assume that Sears' reference to the "second day of trial" in its motion to correct errors is either a typographical error or a memory lapse.

7. Manuilov's assertion to the contrary on this point is not supported by the record.

8. In reviewing the record, it is impossible to determine whether Manuilov unequivocally admitted to any specific acts of violence in response to Sears' inquiry; consequently, we have refrained from summarizing the content of Manuilov's answers and have limited our recital of the facts to the substance of Sears' questions. Manuilov did admit that he was arrested and put in jail after Kurihara called the police on December 13, 1995.

ments and then we can address the issue of whether or not the Jury should [hear] it.

The trial court then admitted the faxed documents "for purposes only of the issue raised on the offer to prove and the argument thereon concerning the admissibility of this evidence before the Jury."[9]

Sears then argued that Manuilov's testimony was both relevant and had probative value with respect to undermining Blinder's opinion about malingering and determining the "huge" issue of Manuilov's credibility in general, and that any prejudice resulting from the admission of the disputed testimony would not substantially outweigh its "incredible" relevance and probative value. Manuilov's counsel asserted that the prejudicial impact of the testimony would outweigh its probative value and would "destroy" the case and turn it into a criminal trial about "whether or not it's okay to . . . for a man to strike a woman and threaten to kill her." The trial court replied,

> Obviously, I'm . . . I'm concerned, certainly the plaintiff's credibility is . . . is an issue at this point because of the information that was divulged. The timing of the divulging of the information really strikes me as being interesting, but I don't have any control over that except through my . . . my deadlines and cut-off dates. The prejudicial impact of the Jury receiving this information would certainly be uh . . . regardless of what kind of limiting instructions the Court gave or cautioned or so forth would far outweigh, in my opinion, the probative value. . . . [I]t's my determination that . . . and I think the offer to prove is sufficient for the record, that this information will not go to the Jury.

On October 23, 1997, the jury found in favor of Manuilov, but determined that he had been 20 percent at fault in contributing to the cause of his damages; consequently, the total damage award of $1,750,000 was reduced by 20 percent to $1,400,000.

Sears filed a motion to correct errors on November 21, 1997, which was denied by the trial court on February 10, 1998.

### Discussion and Decision

#### *Standard of Review*

The admission or exclusion of evidence is a matter of discretion for the trial court. *Zemco Mfg., Inc. v. Pecoraro*, 703 N.E.2d 1064, 1069 (Ind.Ct.App.1998), *trans. denied* (1999). This Court will reverse a trial court's decision only if it abuses its discretion; "that is, only when the trial court's action is clearly erroneous and against the logic and effect of the facts and circumstances." *Id.* The erroneous exclusion of evidence requires reversal "only if the error relates to a material matter or substantially affects the rights of the parties." *Id.; see also* Ind. Evidence Rule 103(a). "Any error in the admission of evidence is harmless if the same or similar evidence is submitted without objection." *Homehealth, Inc. v. Northern Indiana Public Service Co.*, 600 N.E.2d 970, 974 (Ind.Ct.App.1992).

We further note that all relevant evidence is admissible, except as provided by statute or rule; evidence that is not relevant is inadmissible. Ind. Evidence Rule 402. " 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable

---

9. The documents include an "ATTACHMENT To Application For TEMPORARY PROTECTIVE ORDER" describing an incident of physical abuse on December 13, 1995; an untitled document dated December 15, 1995, and signed by Kurihara that is obviously related to the temporary protective order; a "RECOMMENDATION REGARDING TEMPORARY PROTECTIVE ORDER" against Manuilov from the District Court, Family Division of Clark County, Nevada, filed December 19, 1995, and signed by a district court master who recommended that a hearing be held and that the order be granted; a "TEMPORARY PROTECTIVE ORDER AGAINST DOMESTIC VIOLENCE" from the same court filed December 19, 1995, and containing the names of both Manuilov and Kurihara as adverse parties; a "RETURN OF SERVICE" form dated December 28, 1995, and filed January 10, 1996, certifying the delivery of the temporary protective order and the relevant application and attachment; and "TEMPORARY PROTECTIVE ORDER COURT MINUTES" dated January 11, 1996, which notes that the commissioner found Manuilov in contempt of court for violating the protective order and sentenced him to 25 days (suspended) in the Clark County Detention Center; the commissioner also recommended that the protective order be dissolved.

than it would be without the evidence." Ind. Evidence Rule 401. As a final consideration, otherwise relevant evidence "may be excluded if its probative value is *substantially outweighed* by the danger of unfair prejudice, confusion of the issues, or misleading the jury...." Evid. R. 403 (emphasis supplied).

## I. Admissibility of Manuilov's testimony regarding alleged domestic violence

■■■ "In ruling on the relevancy of evidence, the trial court is accorded wide latitude to determine the probative value of evidence in contrast to its prejudicial impact." *Barnes v. Barnes,* 603 N.E.2d 1337, 1343 (Ind.1992). "However, relevant evidence—that which logically tends to prove a material fact—is not inadmissible simply because of its prejudicial impact." *Id.* "It is only when the evidence is merely marginally relevant that the trial court has discretion to exclude it by balancing the probative value against the prejudicial impact." *Id.*[10] Procedurally, Ind. Trial Rule 43(B) provides in relevant part that a party "may call an adverse party ... and interrogate him by leading questions and contradict and impeach him in all respects as if he had been called by the adverse party." This precept is complemented by Ind. Evidence Rule 607, which states that "[t]he credibility of a witness may be attacked by any party, including the party calling the witness."

From what we can discern from the record, Sears planned to ask Manuilov whether he had ever abused Kurihara; if he denied any abuse, Sears was prepared to question him from the faxed Nevada court documents (without seeking to admit them into evidence) and call Kurihara as a witness to impeach Manuilov. Sears argued that his testimony would undermine Blinder's opinion

that he was not a malingerer and, more importantly, would undermine Manuilov's credibility, which Sears contended was "massively at issue in this case." Manuilov's counsel argued that the testimony would address only one element of Blinder's opinion regarding malingering; that Blinder was unavailable and could not immediately testify to the effect the testimony would have on his opinion; and that the prejudice inherent in Manuilov's testimony would "destroy" the case. Sears followed the trial court's suggestion to conduct an offer of proof; in an apparent attempt to expedite the procedure, Manuilov's counsel offered to "stipulate into the record, for the purpose of [the] offer to prove, whatever is in those documents and then we can address the issue of whether or not the Jury should [hear] it."

One obvious drawback to reviewing the trial court's ruling on this issue is that the testimonial sequence and the relevant tactical considerations would undoubtedly develop much differently during a new trial: Manuilov is now aware of the information contained in the faxed documents, and, if true, he can certainly apprise his medical experts of this potentially damaging evidence in an attempt to "pre-empt" a possible attack by Sears. On a similar note, Sears would not have to face the possibility of a continuance or even sanctions as a consequence of ambushing Manuilov with an eleventh-hour fax from Nevada. Nevertheless, we must confine our review to the propriety of the ruling that the lower court was forced to make amidst the tumult and the shouting of a jury trial.

Although the application of Ind. Evidence Rule 404(b) has been confined almost exclusively to criminal law, we find it helpful as a starting point in our analysis.[11] *See* Ind.

---

10. As mentioned above, Sears' counsel made the following observation regarding "prejudice" during his attempt to introduce the contested evidence: "[T]here's two kinds of prejudice ... [u]nfair prejudice that ... leads to confusion and giving the evidence more weight than it deserves, and there's the other part of prejudice, which is the fact that it's true and just hurts their case." This sentiment echoes Judge Staton's observation in *Cadiz v. State:* "However, the inquiry is not whether evidence is prejudicial; rather, the inquiry is whether the evidence is unfairly prejudicial since all relevant evidence is inherently prej-

udicial." 683 N.E.2d 597, 600 (Ind.Ct.App. 1997). "Prejudice" may be generally defined as "[a] leaning towards one side of a cause for some reason other than a conviction of its justice," or specifically with respect to evidence as an "undue tendency to move [a] tribunal to decide on [an] improper basis [citation omitted]." BLACK'S LAW DICTIONARY 1179 (6th ed.1990).

11. "The well established rationale behind Evidence Rule 404(b) is that the jury is precluded from making the 'forbidden inference' that the defendant had a criminal propensity and there-

Evidence Rule 101(a) (rules of evidence "apply in all proceedings" except as otherwise required by constitution or rule). Evid. R. 404(b) reads in relevant part:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, intent, preparation, plan, knowledge, identity, or absence of mistake or accident . . .

With respect to criminal cases, our supreme court has held that Indiana's standard for assessing the admissibility of Evid. R. 404(b) evidence is as follows:

> (1) the court must determine that the evidence of other crimes, wrongs, or acts is relevant to a matter at issue other than the defendant's propensity to commit the charged act; and (2) the court must balance the probative value of the evidence against its prejudicial effect pursuant to Rule 403 [footnote omitted]. When inquiring into relevance, the court may consider any factor it would ordinarily consider under Rule 402.

*Hicks v. State*, 690 N.E.2d 215, 221 (Ind. 1997). Our supreme court has further determined that the list of "other purposes" mentioned in the rule "is not exhaustive; extrinsic act evidence may be admitted for any purpose not specified in Rule 404(b) unless precluded by the first sentence of Rule 404(b) or any other Rule." *Thompson v. State*, 690 N.E.2d 224, 233 (Ind.1997).

In his 12 INDIANA PRACTICE § 404.233, 455–456 (2d ed.1995), Judge Robert Lowell Miller, Jr. notes that there is a split among the federal courts as to whether Federal Rule of Evidence 404(b) "touches upon the use of extrinsic act evidence for impeachment of a witness.[ ] [12] Because Rule 404(a)(3) addresses the character of a witness, Rule 404(b) may not apply at all to impeachment of a non-party witness." [13] Judge Miller further observes, "It would seem that in light of the limited exclusionary effect of Rule 404(b), Rule 404(b) should not prohibit extrinsic act evidence offered for impeachment purposes,[ ] but other evidence rules may apply [footnote cross-references commentary on Ind. Evidence Rule 608(b) ]." *Id.* at 456. Evid. R. 608(b) reads as follows:

> **(b) Specific Instances of the Conduct of a Witness.** For the purpose of attacking or supporting the witness's credibility, other than conviction of a crime as provided in Rule 609, specific instances may not be inquired into or proven by extrinsic evidence. They may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness concerning the character for truthfulness or untruthfulness of another witness as to which character the witness being cross-examined has testified.

Referring to Indiana's version of Evid. R. 608(b), Judge Miller states that "a party may not, with very limited exceptions,[ ] show a witness's character, for impeachment purposes, by proof of or reference to specific acts of misconduct or immorality not resulting in a conviction, either on cross examination or by extrinsic proof.[ ]" 13 INDIANA PRACTICE § 608.201, 137 (2d ed.1995).

Indiana Rule 608(b) differs substantially from Federal Rule 608(b) insofar as the federal rule grants the trial court discretion to allow inquiry into specific acts, not amounting to a conviction, on cross examination of the impeachee.[ ] A party may not embark upon such an inquiry under the Indiana rule *except when the door has been opened by other evidence*,[ ] or, perhaps, as to prior false accusations by the victim in a sex offense prosecution. At least one commentator has spoken in favor of Indiana's approach, describing the view taken in the federal rules as "simply a mistake."[ ]

---

fore engaged in the charged conduct." *Thompson v. State*, 690 N.E.2d 224, 233 (Ind.1997).

12. We will hereinafter indicate the omission of footnotes as "[ ]" for purposes of legibility.

13. Ind. Evidence Rule 404(a)(3) provides that "[e]vidence of the character of a witness, as provided in Rule 607, 608 and 609" is admissible to prove that the witness acted in conformity with her character or a trait of character.

*Id.* at 139 (emphasis supplied).[14]

Judge Miller notes that Evid. R. 608(b) "prohibits inquiry and extrinsic evidence alike. The prohibition against impeachment by specific acts offered to show conduct has been applied to bar evidence of or inquiry into prior arrests not amounting to conviction[ ] even if the prior conduct involved trial participants ...." *Id.* at 138. However, Judge Miller mentions several exceptions to the inadmissibility of specific acts for impeachment purposes, including the following:

> Generally, if a party touches incompletely on a subject in direct examination,[ ] leaving the trier of fact with a false or misleading impression of the facts related, the door may be opened [15] to the cross examiner to explore the subject fully by bringing out otherwise inadmissible material.[ ] This doctrine is equally applicable when a party, through testimony introduced through the party or his witnesses, leaves the trier of fact with a false or misleading impression of the character of the party or his witnesses. If other evidence or testimony sufficiently corrects the misimpression, however, the trial court may decide to close the door and enforce traditional limitations on cross-examination.[ ] In any event, the responding evidence must somehow relate to the evidence by which the door is claimed to have been opened.[ ]

*Id.* § 608.207 at 150–151.

Judge Miller cites numerous cases that illustrate Indiana's application of this exception to the rule, all but one of which predate our adoption of the Indiana Rules of Evidence on January 1, 1994.[16] Nevertheless, in reviewing the various factual situations in which our appellate courts have invoked the exception and their stated rationale for doing so, we cannot find any persuasive reason to abolish this exception.

In *Fahler v. Freeman,* this Court upheld the trial court's admission of evidence that a personal injury plaintiff had received worker's compensation benefits to reimburse his medical expenses, when the plaintiff had left the obvious impression that he had paid the expenses himself:

> In this cause, the questions were offered for purposes of impeachment of the plaintiff's prior testimony and, on these facts, properly so. The direct questioning of the plaintiff and his careful answers appeared to be clearly designed to leave the jury with a false impression. The direction of the plaintiff's testimony departed from the issue of the amount of damages he had allegedly sustained and then focused upon who had actually paid for them. Plaintiff entered this area at his peril.... Where evidence on a certain issue is introduced by one party, and it appears likely that the other party will be prejudiced unless he is permitted to introduce contradictory or explanatory evidence, such evidence should be permitted.

---

**14.** Federal Rule 608(b) reads in relevant part as follows:

> Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' credibility, other than conviction of crime as provided in rule 609, may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness *(1) concerning the witness' character for truthfulness or untruthfulness,* or (2) concerning the character for truthfulness or untruthfulness of another witness as to which character the witness being cross-examined has testified. [Emphasis supplied.]

**15.** In his discussion of Ind. Evidence Rule 404(a), Judge Miller is careful to draw the distinction between a party *placing a person's character "in issue"* ("determined by reference to the substantive law and the pleadings," i.e., "[i]f a party's character constitutes an essential element of proof of a charge, claim, or defense by a party") and a party *"open[ing] the door* to an opponent's presentation of otherwise inadmissible evidence" by presenting certain evidence of *its own;* Ind. Evidence Rules 608(b) and 611 govern the admissibility of evidence in the context of "opening the door." (Emphasis supplied.) 12 INDIANA PRACTICE § 404.103 at 340–341.

**16.** *See Reeves v. Boyd & Sons, Inc.,* 654 N.E.2d 864 (Ind.Ct.App.1995), *trans. denied* (1996) below. Although the exact date of the original trial does not appear in this opinion, we acknowledge that it almost certainly occurred before the adoption of the Indiana Rules of Evidence in January 1994. As will be seen from the following cases, both the general rule of law prohibiting the admission of specific acts for impeachment purposes and its exception in the case of a party "opening the door" predate the adoption of the Indiana Rules of Evidence by many years.

143 Ind.App. 493, 497–498, 241 N.E.2d 394, 396 (1968) (citations omitted).[17]

In *Storey v. State,* our supreme court found no error in the trial court's admission of evidence that the defendant had been convicted of an assault in 1959, where defendant's psychologist had reviewed his medical history dating back to 1968 and opined that an embolism suffered during that year had contributed to his "chronic organic brain disorder" and had "reduced his capacity to handle stressful situations, to make judgments, and to control his impulses, especially fear." 552 N.E.2d 477, 481 (Ind.1990). While noting the general rule that only convictions for infamous crimes or crimes involving dishonesty or false statement may be used to impeach a witness,[18] the supreme court made the following distinction:

> In the present case, the State attempted to refute the opinion of the defendant's psychologist by attacking the information upon which it was based as well as its conclusion. The evidence of the facts of the 1959 assault conviction tended to refute the psychologist's opinion regarding the defendant's reduced capacity to handle stress and fear following the 1968 brain embolism and resulting organic brain disorder. Evidence of pre-existing behavioral deficiencies is especially relevant in this case because the psychologist only reviewed the defendant's medical history since 1968. In this regard, the evidence was not offered as proof of the defendant's

guilt of the murder and thus was not erroneously admitted for that reason. . . .

> The questioning of the defendant about information he provided the psychologist was also relevant to show the basis upon which the opinion was formed. The jury was entitled to know the basis upon which it was formed to assist them in assessing the weight it should be accorded [citation omitted]. The psychologist stated that he did consider the defendant's assault conviction, although he discounted its importance in his decision-making. The defendant's answers indicate that he may have provided the psychologist with an incomplete history of his violent acts, which indicated behavioral deficiencies. In essence, the State's principal purpose was to attack the reliability of the psychologist's opinion, not to impeach the defendant by improper means.

*Id.* at 482.

Several obvious factual parallels may be drawn between *Storey* and the instant case with respect to Blinder's opinion on malingering, although we acknowledge that Sears also offered evidence of Manuilov's alleged violent acts for the purpose of impeaching the plaintiff's credibility (*see* footnote 18 above). With respect to plaintiffs attempting to "close" evidentiary doors that they have opened of their own accord, we reflect on Justice Dickson's observation in *Barnes:*

> Unlike the victim in a criminal case, the plaintiff in a civil damage action is "on

---

17. Consider the following instructive language from *Breese v. State,* 449 N.E.2d 1098, 1117 (Ind.Ct.App.1983):

> It is incorrect to say that a witness's testimony is "impeached" by a statement of a third party which merely disputes or is contrary to the facts stated by the first witness. Such statement if otherwise admissible is merely evidence placing the matter in dispute for resolution by the trier of fact [citation omitted]. Breese cites [*Fahler*] as support for his argument that he should have been permitted to present contradictory evidence to "counteract the false impression created by Dr. Moore." . . . However, *Fahler* did not involve attempted "impeachment" by a third person's statement but rather the statement of the witness, and is thus distinguishable.

18. *Cf., e.g., Heck v. State,* 552 N.E.2d 446, 452 (Ind.1990), *cert. denied, Heck v. Richards,* 507 U.S. 929, 113 S.Ct. 1308, 122 L.Ed.2d 696 (1993)

(no error found in allowing testimony of defendant's daughter that defendant had threatened to retaliate against her alleged rapist; defendant had "attempted to intimate that someone else, such as his daughter Roberta, had been responsible" for his wife's death; defendant had therefore "opened the door" to daughter's rebuttal testimony); *Christopher v. State,* 531 N.E.2d 480, 482 (Ind.1988):

> The cross-examination of appellant [convicted of conspiracy] as to whether his wives were fearful of him came about by reason of his gratuitous testimony on direct examination that he never threatened his wives at any time. He thus injected the issue of his treatment of his wives. It was thus legitimate for the State to pursue that open door to attempt to ascertain the true situation.

trial" in the sense that he or she is an actual party seeking affirmative relief from another party. Such plaintiff is a voluntary participant, with strong financial incentive to shape the evidence that determines the outcome. It is antithetical to principles of fair trial that one party may seek recovery from another based on evidence it selects while precluding opposing relevant evidence on grounds of prejudice. 603 N.E.2d at 1342.

■ In *City of Indianapolis v. Swanson,* 448 N.E.2d 668, 670 (Ind.1983), our supreme court held that the trial court had erred in excluding evidence that the plaintiff in a personal-injury action had sold drugs to and made statements to an undercover police officer that he had purposely failed a physical "for the purposes of this trial"; that he did not suffer from seizures as a result of his accident; and that he had sold drugs before. The supreme court found that Swanson's statements were relevant and "went to the very heart of his claim against the City" with respect to his alleged suffering from *grand mal* epilepsy and his inability to make a living. *Id.* at 671. Manuilov attempts to distinguish *Swanson* from the case at bar on a factual basis; however, we are convinced that because Manuilov's chances for recovery depended substantially upon his credibility in describing his subjective injuries to both Blinder *and* the jury, the supreme court's reasoning in *Swanson* still applies: "a trial court may not properly deny the cross-examination of a party concerning facts connected with that party's own acts and statements relating to the case which tend to impair that party's credibility." *Id.* at 671–672.

■ The same logic may be applied to Blinder's expert scientific opinion concerning malingering. We fail to see how the evidentiary door could have been opened any more widely or how a more blatant false impression could have been created in this case: Manuilov's counsel intentionally and specifically elicited Blinder's opinion that Manuilov was not a malingerer; before Sears received the Nevada court documents, Blinder testified on cross-examination that he had discovered "no criminal history or anti-social behavior" in Manuilov's background, having "specifically asked" Manuilov and his attorney. Manuilov offers no support for his assertion that the evidence of his alleged acts of domestic violence should be excluded simply because it contradicts only one factor that Blinder considered in formulating his opinion on malingering; nor does he mention that Blinder gave detailed testimony on far fewer than the approximately 30 factors included in his textbook.

■ As for Manuilov's argument that Sears was required to call an expert (either Blinder or one of its own) to "contextualize" the meaning of the excluded testimony, we find that his reliance on *Mankey v. Bennett,* 38 F.3d 353 (7th Cir.1994) is misplaced; not only had the trial court in *Mankey* previously granted a motion in limine with respect to the excluded evidence of the plaintiff's history of drug and alcohol abuse, but the defendant sought to introduce this evidence through its own unlisted (and therefore ultimately excluded) expert witness solely for the purpose of showing its impact on the plaintiff's "life expectancy and future earning capacity." *Id.* at 359–360. The fact that Blinder was not readily available to testify about the effect the excluded evidence might have on his opinion is of no moment here; Manuilov could have requested a continuance to obtain his testimony either in person or by other means. Moreover, Sears was not required to provide an expert witness to "contextualize" the effect of its evidence on Blinder's opinion; Sears' primary reason for offering the evidence was to undermine the factual basis for his expert opinion, not to advance an expert opinion of its own. Although the timing of Sears' discovery of the contested evidence can best be described as curious, the trial court did not exclude it on the basis of unfair surprise, and we may not ponder this question on appeal.

Additionally, we note that the Evid. R. 608(b) exception with respect to a plaintiff "opening the door" to the admission of certain evidence is closely connected with Ind. Evidence Rule 611(b), which provides that cross-examination "should be limited to the subject matter of the direct examination and matters affecting the credibility of the witness. The court may, in the exercise of

discretion, permit inquiry into additional matters as if on direct examination." In *Reeves v. Boyd & Sons, Inc.,* 654 N.E.2d 864, 872 (Ind.Ct.App.1995), *trans. denied* (1996), the plaintiff in a personal-injury action and his mother were questioned about his previous conviction for driving while intoxicated, after his mother had implied that the plaintiff "did not partake of alcoholic beverages." This Court held that under Evid. R. 611(b), the defendant was allowed to rebut this implication on cross-examination; citing Judge Miller, we further held that the defendant was entitled to present otherwise inadmissible evidence to contradict a false impression left by the plaintiff, who had "opened the door" on direct examination. *Id.,* citing 13 INDIANA PRACTICE § 611.204 at 201.

Having considered the admissibility of the contested testimony in the context of evidence rules governing impeachment and extrinsic evidence, we realize that it must also be reviewed contemporaneously with the relevance and probative value requirements of Evid. R. 401, 402, and 403. Clearly, any evidence tending to prove that Manuilov failed to "pass muster" with one of Blinder's malingering factors would be more than marginally relevant with respect to both Manuilov's credibility and the soundness of Blinder's opinion. Evidence of Manuilov's alleged acts of domestic violence and his subsequent failure to disclose this information to either Blinder or his attorney, although inherently prejudicial, nevertheless contains sufficient probative value with respect to the relevance factors mentioned above as not to be substantially outweighed by the danger of unfair prejudice.

Finally, we would be remiss if we did not address the significance of Ind. Evidence Rule 105 with respect to this issue: "When evidence which is admissible as to one party or for one purpose but not admissible as to another party or for another purpose is admitted, the court, upon request, shall restrict the evidence to its proper scope and admonish the jury accordingly." Manuilov could have requested such an instruction, which would have strictly limited the jury's consideration of the evidence to the soundness of Blinder's opinion on malingering and Manui-

lov's credibility. The trial court was also permitted to give a limiting instruction of its own volition: "Rule 105 does not preclude trial courts from giving a limiting admonition or instruction sua sponte as a matter of discretion,[ ] but by its plain terms imposes no affirmative duty to do so.[ ]" *Humphrey v. State,* 680 N.E.2d 836, 839 (Ind.1997), citing 12 INDIANA PRACTICE § 105.103 at 106–08 (second citation omitted).

In conclusion, we hold that because Manuilov's testimony regarding his alleged acts of domestic violence (1) would not have violated the admissibility requirements of Evid. R. 404(b); (2) would be considered an exception to the admissibility requirements of Evid. R. 608(b); (3) was relevant under Evid. R. 401 and 402; (4) had probative value that was not substantially outweighed by the danger of unfair prejudice under Evid. R. 403; and (5) substantially affected Sears' right to correct a false impression created by Manuilov concerning the material issue of his credibility as well as the soundness of Blinder's opinion on malingering, the trial court abused its discretion and committed reversible error in excluding this evidence from the jury. *See Zemco Mfg., Inc.,* 703 N.E.2d at 1069.

## II. Admissibility of expert scientific testimony

Because we reverse the trial court's judgment on the basis of its erroneous exclusion of testimony regarding Manuilov's alleged acts of domestic violence, we are not required to address the trial court's decision to admit the opinions of Quillen and Blinder concerning post-concussion syndrome, the etiology of Manuilov's symptoms, and other scientific matters. However, because of the likelihood that the issue of expert scientific testimony will resurface during a new trial, we find it prudent to address this issue on the merits.

In a negligence action, a reasonable connection must be established between the defendant's conduct and the damages suffered by the plaintiff. *Roberson v. Hicks,* 694 N.E.2d 1161, 1163 (Ind.Ct.App.1998), *trans. denied.* At a minimum, this reasonable connection requires causation in fact: "that the harm would not have occurred 'but for' the defendant's conduct." *Id.* "The plaintiff's burden may not be carried with

evidence based merely upon supposition or speculation." *Id.* When an injury is objective in nature, the plaintiff is competent to testify about the injury, "and such testimony may be sufficient for the jury to render a verdict without expert medical testimony." *Id.*

██ In the instant case, although the actual blow to Manuilov's head would be considered an objective injury, it would current-, ly be much more difficult, if not impossible, to determine the presence and extent of any concomitant physical injury to his brain. The resulting *symptoms* of which he complains—including recurrent headaches and dizziness—are purely subjective. More importantly, it is these *symptoms* that have prevented Manuilov from resuming his career as a high-wire artist, although we recognize that the symptoms and any physical brain injury from which they arose would be inextricably intertwined.

██ The only evidence that Manuilov himself would be able to offer about the causal connection between his fall at Sears and the onset of his symptoms is their close temporal relationship. "Such a blunt inference cannot provide a reasonably reliable explanation for complex, unseen physiological processes. While a temporal congruity may be some evidence of causation, it is insufficient evidence to move the merely possible to the reasonably probable." *Porter v. Whitehall Laboratories, Inc. (Porter I),* 791 F.Supp. 1335, 1341–1342 (S.D.Ind.1992), *aff'd* 9 F.3d 607 *(Porter II)* (7th Cir.1993); *see also Bradley v. Brown,* 852 F.Supp. 690, 697 (N.D.Ind.1994), *aff'd* 42 F.3d 434 (7th Cir. 1994) (quoting *Porter I;* plaintiffs could not prove causation of their multiple chemical sensitivities "merely by reliance upon the temporal congruity" of pesticide application and onset of their symptoms; expert scientific testimony was required); *Daub v. Daub,* 629 N.E.2d 873, 878 (Ind.Ct.App.1994), *trans. denied* (expert opinion required to confirm plaintiff's hypothesis that back ailment was caused by slip on patio; otherwise, plaintiff "has established nothing more than the facts which make up her allegation").

██ We are therefore led to the conclusion that expert scientific testimony is required to establish and explain the complex causal relationship between Manuilov's fall and his injuries. "When the issue of cause is not within the understanding of a lay person, testimony of an expert witness on the issue is necessary." · *Id.* "An expert, who has the ability to apply principles of science to the facts, has the power to draw inferences from the facts which a lay witness or a jury would be incompetent to draw." ·*Id.* The admissibility of expert testimony is a matter within the sound discretion of the trial court. *Lytle v. Ford Motor Co.,* 696 N.E.2d 465, 470 (Ind. Ct.App.1998). However, "[w]here incompetent evidence on a material point in favor of the party who introduces it is admitted, the presumption is that it is influential, and prejudice to the objecting party will be presumed." *Sierp v. Vogel,* 592 N.E.2d 1253, 1255 (Ind.Ct.App.1992), *trans. denied.*

In reviewing the admissibility of expert scientific testimony, we first turn to the requirements of Evid. R. 702 and 703. The two rules read as follows:

### Rule 702. Testimony by Experts

(a) If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise.

(b) Expert scientific testimony is admissible only if the court is satisfied that the scientific principles upon which the expert testimony rests are reliable.

### Rule 703. Bases of Opinion Testimony by Experts

The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. Experts may testify to opinions based on inadmissible evidence, provided that it is of the type reasonably relied upon by experts in the field.

It is important to note that Evid. R. 702(b) does not have a counterpart in the Federal Rules of Evidence and was adopted before the U.S. Supreme Court's landmark decision

addressing the reliability of expert scientific testimony in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).[19] *See McGrew v. State,* 682 N.E.2d 1289, 1290 (Ind.1997). The Indiana Supreme Court has held that the reliability principles expressed in *Daubert* are "not binding upon the determination of state evidentiary law issues," but are "helpful to the ·bench and bar in applying [Evid. R. 702(b) ]." *Steward v. State,* 652 N.E.2d 490, 498 (Ind.1995).

 Evid. R. 702 demands that the trial court serve as a "gatekeeper" to ensure that "an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Hottinger v. Trugreen Corp.,* 665 N.E.2d 593, 596 (Ind.Ct.App.1996), *trans. denied.* "When faced with a proffer of expert scientific testimony, the court must make a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and whether that reasoning or methodology properly can be applied to the facts in issue."[20] *Id.* Thus, before an expert scientific witness may testify, the trial court must obviously determine that she is sufficiently qualified "by knowledge, skill, experience, training, or education" under Evid. R. 702(a). *See Dorsett v. R.L. Carter, Inc.,* 702 N.E.2d 1126, 1128 (Ind.

Ct.App.1998) (quoting [13] INDIANA PRACTICE § 702.201, 392).[21] The trial court must also ensure that any facts upon which an expert bases her opinion or inference be "of the type reasonably relied upon by experts in the field" under Evid. R. 703.

 Although courts have identified various factors to determine reliability, "there is no specific 'test' or set of 'prongs' which must be considered" to satisfy Evid. R. 702(b). *McGrew,* 682 N.E.2d at 1292. Some factors of scientific validity listed in *Daubert* and considered by Indiana courts include whether the theory or technique at issue "can be (and has been) tested"; "whether the theory or technique has been subjected to peer review and publication"; and general acceptance of the theory or technique within a relevant scientific community. *Daubert,* 509 U.S. at 593–594, 113 S.Ct. at 2796–2797, 125 L.Ed.2d at 482–483; *McGrew,* 682 N.E.2d at 1292, n. 5; *Hottinger,* 665 N.E.2d at 596.

 With respect to an opinion regarding medical causation, an additional reliability factor to be considered is whether the expert has successfully ruled out other possible causes of the injury for which the plaintiff seeks redress. *See Tucker v. Nike, Inc.,* 919 F.Supp. 1192, 1196–1197 (N.D.Ind.1995), quoting *Porter II,* 9 F.3d at 613 ("most troubling aspect" of plaintiff's medical expert's

**19.** In *Kumho Tire Company, Ltd. v. Carmichael,* —— U.S. ——, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999), the U.S. Supreme Court held that the "gatekeeping" function of Federal Rule of Evidence 702 applies to all expert testimony.

**20.** In the federal system, the trial court must make this "preliminary assessment" pursuant to an Federal Rule of Evidence 104(a) *Daubert* hearing. *See Daubert,* 509 U.S. at 592, 113 S.Ct. at 2796, 125 L.Ed.2d at 482. Although our supreme court has not specifically mandated *Daubert* hearings as a prerequisite for determining the admissibility of expert scientific testimony (i.e., in addition to or to the exclusion of preliminary questions or offers to prove), we note that the stated purpose of the Indiana Rules of Evidence under Ind. Evidence Rule 102 is to "elimina[te] unjustifiable expense and delay"; in the interest of promoting sound trial practice, we therefore encourage trial courts to conduct *Daubert* hearings under Evid. R. 104(a) before trial. During the hearing and at trial, counsel should preserve a proper record for appeal in the form of specific objections, preliminary questions, or offers to prove, in the event that certain testimony is ruled either admissible or inadmissible by

the trial court. Furthermore, although we are aware that a trial court is not "bound by the Rules of Evidence, except those with respect to privileges" in determining "the qualification of a person to be a witness" or "the admissibility of evidence" under Evid. R. 104(a), and that certain evidence presented at such a hearing may therefore be considered inadmissible at trial or simply never offered at trial, a party must lay a similarly sufficient evidentiary foundation for a jury before it may elicit certain testimony from an expert witness. The requirement to make such a record must be taken in conjunction with Ind. Evidence Rule 705: "The expert may testify in terms of opinion or inference and give reasons therefor without first testifying to the underlying facts or data, unless the court requires otherwise. The expert may in any event be required to disclose the underlying facts or data on cross-examination."

**21.** *See also* ROBERT LOWELL MILLER, JR., 13B INDIANA PRACTICE, COURTROOM HANDBOOK ON INDIANA EVIDENCE 207 (1999).

testimony "is his failure to consider other causes of the accident in forming his opinion"; expert "never acted to exclude these factors as possible causes in this case" and "never bothered to discover the facts concerning these other factors"; expert's testimony "provides no scientific basis for excluding these other factors as potential causes for [p]laintiff's injury," rendering his opinion "nothing more than 'subjective belief' and 'unsupported speculation' which is not the proper subject of expert testimony under *Daubert*").

Finally, the trial court should consider the relevance and probative value requirements of Evid. R. 401, 402, and 403. In *Hottinger*, this Court approvingly noted the following language from *Daubert*:

The inquiry envisioned by Rule 702 is, we emphasize, a flexible one.[ ] Its overarching subject is the scientific validity—and thus the evidentiary *relevance* and reliability—of the principles that underlie a proposed submission. The focus, of course, must be solely on principles and methodology, not on the conclusions that they generate.

665 N.E.2d at 596–597, quoting *Daubert*, 509 U.S. at 594–595, 113 S.Ct. at 2797, 125 L.Ed.2d at 483–484 (emphasis added, footnote in original omitted).

Having explored the admissibility and reliability issues raised in *Daubert*, we particularly lament Sears' failure to furnish this Court with a transcript of the trial court's hearing on its motions in limine. Presumably, the trial court did evaluate the qualifications of both Quillen and Blinder and the reliability of the scientific principles undergirding their opinions. Notwithstanding its motions in limine, however, Sears was required to make its record at trial concerning the admissibility of the opinions of Quillen and Blinder. We therefore focus our review on the trial transcript to determine whether the trial court abused its discretion in admitting the testimony of Manuilov's expert witnesses.[22]

### IIA. Quillen's opinion

At trial, Quillen was permitted to give his opinion that Manuilov suffers from post-concussion syndrome (manifested as persistent headaches and dizziness), and that the cause of these symptoms was the blow to the head he received from his fall in the Sears store. Quillen also testified that headaches and dizziness can have many different causes in medicine, such as a migraine, and

**22.** We first note that Sears raised an objection to Quillen's testimony about post-concussion syndrome "for all the reasons expressed in [its] pretrial motion [in limine]," subsequently requested a continuing objection *"for this witness,"* and only later raised a more specific objection to such testimony (emphasis supplied). In *Ḥobson v. State*, 495 N.E.2d 741, 744 (Ind.Ct.App.1986), this Court approved the use of continuing objections; however, we stress that the "record must demonstrate that the continuing objection or reference to a prior objection fully and clearly advises the trial court of the specific grounds for the objection." *Smith v. State*, 565 N.E.2d 1059, 1061 (Ind.1991). Here, as did our supreme court in *Smith*, we find that Sears' reference to its motion in limine sufficiently apprised the trial court of the specific basis for its objection and thus preserved the issue for our review. *See id.; see also Carter v. State*, 634 N.E.2d 830, 832–833 (Ind.Ct.App.1994) (purpose of motion in limine is to "prevent the display of potentially prejudicial material to the jury until the trial court has the opportunity to rule on its admissibility"; however, the trial court's ruling on the motion is not a final ruling on the admissibility of evidence and does not preserve the error for appeal; therefore, a party must object to the "introduction of challenged evidence at trial and specify the grounds upon which the objection is premised"); Ind. Trial Rule 46 (party must "[make] known to the court . . . his objection to the action of the court and his grounds therefor"). With respect to Blinder's testimony about post-concussion syndrome, discussed below, we note that Sears allowed him to expostulate on its possible causes and symptoms and did not object until plaintiff's counsel asked him about his 1991 diagnosis of Manuilov. Because we hold that the trial court committed reversible error on other grounds, however, we need not consider this argument further. *Cf. Fleener v. State*, 656 N.E.2d 1140, 1141 (Ind.1995) ("defense counsel cannot be defaulted for failing to repeat his Rule 702(b) objection after it had once been made, argued, and overruled"). We remain nonplused, however, at Sears' failure to specifically object to the opinions of both Quillen and Blinder that Manuilov's symptoms were caused from the head injury he suffered as a result of his fall in the Sears store. Nevertheless, we find that the unfairly prejudicial effect of the post-concussion syndrome evidence substantially outweighed any corresponding "curative" effect of what appears to be the unchallenged expert opinions regarding causation.

that he was unaware of any information that medical science has been able to provide to establish why Manuilov has the symptoms of which he complains. Finally, Quillen drew his own distinction between a medical "opinion," which he would offer in the absence of a firsthand examination of or "firsthand information" about the patient, and a medical "diagnosis," which would presumably be based on such "firsthand information" and a "very [close firsthand]" examination of the patient.

Sears argues that the trial court should have excluded Quillen's opinion because it "was not reached utilizing the scientific method usually relied upon in the practice of medicine"; because "the cause of symptoms associated with post-concussion syndrome is unknown and scientifically undetectable" and would therefore not be helpful in assisting the jury to determine the cause of Manuilov's symptoms; and because the prejudicial effect of the syndrome evidence would greatly outweigh its probative value under Evid. R. 403. Manuilov responds that post-concussion syndrome is "by no means a recent discovery in the medical profession," and that Quillen was sufficiently qualified as a scientific expert under Evid. R. 702 to give his medical opinion that Manuilov suffered from post-concussion syndrome and that his symptoms "were consistent with the fall he sustained and the existence of such condition." [23]

Even assuming, *arguendo*, that post-concussion syndrome is generally accepted as a valid clinical diagnosis within the medical community and has been subjected to proper scientific scrutiny through peer review and publication, the fact remains that Quillen was able to give his opinion that Manuilov's symptoms were caused by his fall at the Sears store, while at the same time admitting that he could offer no scientific proof for the cause of Manuilov's symptoms. On cross-examination, Quillen stated, "If you're asking am I aware of any information that can ... that has been done that has a concrete objective answer as to the source of his continued problem, no, I do not know of any, nor would

I expect any"; he also acknowledged that he was "unaware of any information that medical science has been able to determine why Mr. Manuilov has these symptoms."

In light of this acknowledgment, it is obvious that Quillen should have attempted to eliminate other possible causes of Manuilov's subjective symptoms in order to support his opinion with the degree of scientific reliability demanded by Evid. R. 702. Quillen did concede that there are many other possible causes of Manuilov's symptoms, but failed to rule them out. In this context, we are particularly troubled by Quillen's distinction between a medical "diagnosis" and a medical "opinion." A "firsthand" pretrial examination of Manuilov may have enabled Quillen to eliminate some of the other possible causes of his symptoms; without this analysis, we are left with nothing more than a form of educated speculation, which does not fulfill the requirements of Evid. R. 702. *See Tucker*, 919 F.Supp. at 1196–1197.

In *Porter I*, Judge Tinder anticipated the Supreme Court's holding in *Daubert* and made the following observations about the perils of allowing scientific experts to speculate on the issue of legal causation:

> The factual basis of a particular medical conclusion is composed of an application of particular scientific facts to particular data about the instant case. Admissible opinions relate instant facts to known relationships; an opinion relating instant facts to an unknown relationship (a hypothesis) does not further the trier of fact's ability to determine a fact dependent upon that hypothetical relationship. Although experts may provide opinions in the form of a hypothetical fact situation, the scientific foundation or reasoning process may not be based on merely hypothetical causal relationships. Unsupported subjective opinion is unhelpful speculation and not admissible under Rule 702....

> In a highly technical case like this, where a lay trier of fact cannot possibly determine

---

**23.** We observe in passing that the most recent Indiana case that contains any mention of post-concussion syndrome is this Court's denial of the appellant's petition for rehearing in *Crown Prod-* *ucts Co. v. Brandenburg,* 126 Ind.App. 48, 130 N.E.2d 73 (1955), which was issued almost 40 years before the adoption of the Indiana Rules of Evidence.

the precise etiology of the injury without guidance from expert opinions, there is a risk that the jury would make an irrational finding of causation based upon the siren-like allure of opinions stated by highly qualified experts. Thus, an expert's opinion must have some basis other than hypothesis before the opinion may have the privilege of being assailed by cross-examination.[ ]

791 F.Supp. at 1345.

 Having admitted that medical science has been unable to determine the cause of Manuilov's symptoms, and having failed to rule out other possible causes for them, Quillen should not have been permitted to offer his opinion regarding post-concussion syndrome to the jury. Although a medical opinion that a patient suffers from the syndrome may provide a valid explanation of her symptoms for purposes of medical treatment, it does nothing to prove the cause-in-fact of a plaintiff's legal injuries. Consequently, an otherwise qualified medical expert who is allowed to offer her opinion that a plaintiff suffers from post-concussion syndrome would be doing nothing more than providing the jury with clinically sound but legally speculative and potentially misleading testimony as to the cause-in-fact of the plaintiff's injuries. Manuilov's argument that cross-examination, presentation of contrary evidence, and proper jury instructions [24] would somehow assist a jury in weighing the validity of post-concussion syndrome evidence fails to consider the "gatekeeping" purpose of Evid. R. 702 with respect to ensuring the reliability of the scientific principles that support a witness's opinion and the legal axiom that evidence of causation may not consist solely of speculation or conjecture. *See City of East Chicago v. Litera,* 692 N.E.2d 898, 901 (Ind.Ct.App. 1998), *trans. denied* ("an expert medical opinion which lacks reasonable certainty is not sufficient to support a judgment standing alone").

We also agree with Sears that any probative value of Quillen's opinion regarding post-concussion syndrome was substantially outweighed by the danger of unfair prejudice and the potential for misleading the jury under Evid. R. 403. Although allowing an expert witness to testify that a party suffers from post-concussion syndrome might be relevant, probative, and only nominally prejudicial in other instances, we are convinced that the testimony in this case was dangerously susceptible of misleading the jury on the issue of causation and was unfairly prejudicial to Sears. Specifically, we are concerned that the expert testimony invited the inference that because Manuilov suffered from post-concussion syndrome, his headache and dizziness symptoms fitting the syndrome pattern must be the result of a physical brain injury he incurred at Sears. *See Daubert,* 509 U.S. at 591, 113 S.Ct. at 2796, 125 L.Ed.2d at 482 ("scientific validity for one purpose is not necessarily scientific validity for other, unrelated purposes"); *Steward,* 652 N.E.2d at 499 (scientific principles underlying child sexual abuse syndrome not sufficiently reliable to allow expert testimony thereon to prove occurrence of abuse, but such testimony may be admissible to explain child's recantation of abuse allegation or "unexpected behavior patterns seemingly inconsistent with the claim of abuse"); *see also Carnahan v. State,* 681 N.E.2d 1164, 1168 (Ind.Ct.App.1997) (Sullivan, J., dissenting) (tendency is to take Battered Women's Syndrome evidence "and to conclude that because the alleged victim fits the profile of a battered woman, it is more likely than not that she was the victim of a battery with reference to the charged crime").

In holding that the trial court abused its discretion in allowing Quillen to offer his opinion about post-concussion syndrome, we do not invade the province of the medical community and suggest that such a diagnosis would be useless in formulating a treatment plan for a patient who exhibits its classic symptoms;[25] nor do we hold medical profes-

---

24. *See, e.g.,* Ind. Evidence Rule 104(e) ("[Evid. R. 104] does not limit the right of a party to introduce before the jury evidence relevant to weight or credibility."). Manuilov's insinuation that Sears may not question the validity of his experts' testimony because it offered no expert testimony of its own is not supported by either case law or rule.

25. As our supreme court noted in *Noblesville Casting Div. of TRW, Inc. v. Prince,* "Medicine, for instance, is not yet an exact science; to

sionals to an impossibly high standard with respect to the factual bases of their expert opinions.[26] Rather, we find that Manuilov failed to demonstrate that Quillen's opinion regarding post-concussion syndrome was based on reliable scientific principles and analysis.

### IIB. Blinder's opinions

Blinder, the psychiatrist who performed psychiatric assessments of Manuilov in July 1991 and in June 1995, testified that in his opinion, Manuilov suffered from a variety of conditions, including anxiety disorder, panic attacks, dysthymia, dizziness, and headaches, all of which are consistent with a diagnosis of post-concussion syndrome. Blinder further opined that Manuilov's symptoms and his fall at the Sears store were causally related, and that the blow he received to his head at Sears had disabled him "for reasons that are combined, both physical and psychological factors." Blinder also stated that he "must leave the question of a possible organic contributive" to Manuilov's complaints of dizziness to his colleagues in physical medicine.[27]

▉ Without going into exhaustive detail or engaging in repetitive analysis on the issue of post-concussion syndrome, we merely note that Blinder agreed with Sears' statements that "[s]hort of an autopsy and ... and maybe not even that, [there is] no test that can detect the changes, uh, the existence of changes to the brain, if any, from the blow to the head," and that "it would be improper for anyone to say that [Manuilov's] medical records prove that [he] has a physical injury in his brain." In light of his acquiescence on this point, and considering his medical opinion that there may be an organic contributive

to Manuilov's symptoms about which he could not testify, we agree with Sears' assertion that Blinder was incompetent to render an opinion that Manuilov had suffered physical brain damage; regardless of his eminent status as a psychiatrist, his impressive credentials do not give him *carte blanche* to engage in unfettered speculation regarding the physical condition of Manuilov's brain.

▉ Similarly, there is no indication that Blinder was qualified to offer an expert opinion on the likelihood that Manuilov could resume his career as a high-wire performer. We agree with Sears that the trial court had initially sustained its objection to Blinder's testimony that Manuilov could "safely cross the high wire" 96 or 97 out of 100 times; we can only presume that the ensuing flurry of objections and responses caused the trial court to mistakenly reverse its original ruling and allow Blinder to repeat his opinion. With respect to the purely speculative nature of Blinder's testimony, we refer to Judge Tinder's opinion in *Porter I*:

> Merely because an opinion of scientific causation comes from a person learned in medical science does not provide that opinion with a sufficient scientific basis. An expert cannot rely solely on his or her own stature, intellect or intuition to support an opinion admissible to aid the trier of fact. The basis—the "reasoning" and "facts and data"—of an opinion is distinct from the expert's qualifications as an expert in the field.

791 F.Supp. at 1345.

▉ Manuilov may be correct that psychiatrists "are uniquely qualified to treat

---

demand reasonable certainty in medical opinions places a sometimes insurmountable barrier in the face of the candid and straightforward medical expert." 438 N.E.2d 722, 727 (Ind.1982).

**26.** Neither do we mean to denigrate the impressive professional qualifications of either Quillen or Blinder, the expert witnesses who testified in the case at bar; however, this Court has held that consideration of an expert's credentials is not conclusive in determining the reliability of his scientific testimony. *Lytle*, 696 N.E.2d at 474.

**27.** At trial, Blinder admitted to making the following statement: "I must leave the question of

a possible organic contributive to Mr. Manuilov's complaints of dizziness to my colleagues in physical medicine. But it is clear that they certainly could be a consequence of panic attacks triggered by the accident of issue and a post-concussive syndrome." To round out our discussion about the uncertainties of causation with respect to post-concussion syndrome, we note that Manuilov testified that he had fallen 40 feet onto concrete during a high-wire act in Madison Square Garden in 1974, after which he experienced temporary paralysis of his right side, remained in the hospital for approximately two months, and did not return to work for eight months.

and diagnose mental and emotional disorders that have a physical etiology," but he fails to demonstrate how a psychiatrist could so precisely and reliably quantify a highwire artist's chances for future vocational success. "Although the testimony need not be known to a certainty, any inference or assertion must be derived by the scientific method." *Hottinger,* 665 N.E.2d at 596. We have failed to discover any factual basis or scientific method behind Blinder's estimate and agree that it was materially prejudicial to Sears and misleading to the jury in its determination of both the severity of Manuilov's injuries and his damages. *See Davis v. State,* 476 N.E.2d 127, 134–135 (Ind.Ct.App.1985), *trans. denied* (1987) ("When unsubstantiated estimates are used in probability calculations, speculation is presented to the jury clothed in scientific accuracy; the prejudicial impact clearly outweighs the probative value. However, where probability testimony is based on empirical scientific data, rather than unsubstantiated estimates, the presentation and admission of probability testimony need not constitute error.").

### III. Damages

Because we reverse the trial court's judgment and remand for a new trial, we need not consider the issue of damages.

### Conclusion

For the foregoing reasons, the judgment of the trial court is reversed, and this cause is remanded for a new trial.

STATON, J., concurs.

RILEY, J., dissents with separate opinion.

### RILEY, Judge, dissenting

I dissent. A determination of the admissibility of expert testimony is a matter generally within the discretion of the trial judge and will not be disturbed absent an abuse of discretion. *Buzzard v. State,* 669 N.E.2d 996, 999 (Ind.Ct.App.1996). I would affirm the trial court's ruling that the prejudicial effect of admitting evidence of alleged domestic violence far outweighed any probative value to the jury.

I would remind the majority of their own caveat that appears in this opinion that we must confine our review to the propriety of the ruling that the lower court was forced to make amidst the tumult and the shouting of a jury trial. It seems their analysis goes far beyond the confines of our appellate review.

Domestic violence evidence is prejudicial by its very nature. The Fourth Circuit Court of Appeals has stated: "We accept without need of extensive argument that implications of child molestation, homosexuality, and abuse of women unfairly prejudice a Defendant." *United States v. Ham,* 998 F.2d 1247, 1252 (4th Cir.1993). Evidence of domestic violence *without* a conviction goes to the character of the offender only. Rule 608(b) is very clear that a trial court cannot allow inquiry into specific acts, *not amounting to a conviction,* on cross examination of the impeachee. There are, of course, exceptions to the Indiana rule that allow inquiry into specific acts when the door has been opened by other evidence. Therein lies the rub.

Dr. Blinder's statement that malingerers are often "wife beaters" does not open the door to allow into evidence all allegations of any type of domestic abuse. In this case, Sears sought to submit to the jury certified records from a civil family court in Clark County, Nevada, that contained allegations of domestic violence made by Manuilov's girlfriend. During the offer to prove, Manuilov categorically denied the allegations. If this testimony of domestic violence that had not been adjudicated in Nevada were allowed, there would have been a trial within a trial. Even the protective order was issued without hearing. Further, there were no criminal charges filed and the civil protective order had already been dissolved by the court. I believe that we must carefully guard what type of "character" evidence is admitted even if the "door" has been opened. I agree with Judge O'Connor when he stated:

> The prejudicial impact of the jury receiving this information would certainly be, regardless of what kind of limiting instructions the court gave or cautioned or so forth, would far outweigh, in my opinion, the probative value.

(R. 797).

Even if the majority opinion is correct, that the allegations of domestic abuse by Manuilov's girlfriend were admissible, this extraneous factor does not rise to the level of reversible error. In *City of Indianapolis v. Swanson*, 448 N.E.2d 668, 670 (Ind.1983), it is easy to see how Swanson's statements with respect to his alleged suffering from epilepsy and his inability to make a living "went to the very heart of his claim against the City."

In this case, however, Dr. Blinder's statement describing the profile of people who misrepresent symptoms in cases with "subjective" disabilities, does not go to the heart of this case. His testimony was that of an expert giving his opinion that considered approximately thirty different symptoms of a malingerer, including "they're wife beaters." In light of the fact that the offer to prove was an affidavit alleging unadjudicated acts of domestic violence, it is hard to say that this is the "heart" of the case. The erroneous exclusion of evidence requires reversal "only if the error related to a material matter of substantially affects the rights of the parties." *Zemco Mfg., Inc. v. Pecoraro*, 703 N.E.2d 1064, 1069 (Ind.Ct.App.1998).

Moreover, the relevancy of this evidence is questionable. The alleged acts of domestic violence took place on December 13, 1995. However, Blinder testified that his last assessment of Manuilov was in June, 1995, and that Manuilov and his attorney had informed him that Manuilov had "no criminal history or [history of] anti-social behavior." There is no inconsistency here. Even in the alleged incident of domestic violence actually occurred, it did not occur until six months after Blinder's last assessment of Manuilov. Thus, there was no evidence that at the time of Blinder's assessment of Manuilov he was misinformed by Manuilov or his counsel regarding an alleged incident that had yet to take place. Accordingly, there was no credibility issue concerning Manuilov to which this evidence would be relevant. Furthermore, the remoteness of this incident additionally calls into question the relevancy of the testimony. Manuilov was injured in January, 1988, and the alleged incident of domestic violence occurred in December, 1995, almost eight years after his injury. The relevancy of an incident that occurred eight years after an injury to show that the plaintiff had been a malingerer during the previous eight years and continued to be malingerer thereafter, is at best suspect and any minimal relevancy was clearly outweighed by the *unfair* prejudice the evidence would have caused if admitted.

I would also affirm the trial court's decision to admit the opinions of Quillen and Blinder concerning post-concussion syndrome that is raised in Issue II. Ind.Evidence Rule 703 allows "an expert witness to base an opinion on information received from others before trial, if the information is of a sort that other experts in the field reasonably" rely upon. Robert Miller, Jr., *Indiana Practice* § 703.106 at 423 (1995). The opinions of the doctors in this case were based on treatment, testing, record review, and examination of Manuilov. It is not necessary to apply a *Daubert* analysis to such routine medical opinions. *Collins v. Commonwealth*, 951 S.W.2d 569, 575 (Ky.App.1997). Post-concussion syndrome is a not a recent development in medical science. The resulting symptoms of which he complains—recurrent headaches and dizziness—are not "purely subjective" when they prevent you from assuming your life-long career. Psychologists are qualified to diagnose mental and emotional disorders that have a physical etiology, such as concussion. Dr. Blinder testified that Manuilov will continue to fear falling from the tightrope because of the headaches and dizziness. The anxiety and depression from his fear of the high-wire resulted from his physical inability to perform while dizzy and in pain. (R. 610–611). The majority states that there was no indication that Dr. Blinder was qualified to offer an expert opinion on the likelihood that Manuilov could resume his career as a high-wire performer. I do not understand their reasoning. The diagnosis of post-concussion syndrome is a clinical diagnosis. Dr. Blinder testified:

They (symptoms) are based upon clinical observations made by many, many people, many other physicians over a long period of time. The patterns are established and the text books, we're taught these patterns

in medical school, and we're trained to recognize and search them out, and recognize them when we encounter our patients in the clinic.

(R. 592–593).

It is within Dr. Blinder's expertise to opine that Manuilov cannot perform on a high-wire.

Dr. Quillen was the emergency room doctor at Reid Memorial Hospital who saw Manuilov immediately after the fall. The diagnosis at that time made by Dr. Quillen was post-concussion dizziness. (R. 514.) He testified that Manuilov had symptoms related to post-concussion syndrome and, in fact, suffers from post-concussion syndrome. His opinion is based on his medical education, his background, training, credentials and experience, the medical records at Reid Memorial Hospital, the information he obtained at the time of the accident and Manuilov's testimony concerning his current symptoms. None of this is subject to a *Daubert* analysis.

The majority opinion concedes that such testimony of an expert witness (Dr. Quillen) might be relevant, probative, and only nominally prejudicial in other instances, that the testimony in this case was susceptible of misleading the jury on the issue of causation. The majority fears that the jury will infer that because Manuilov suffered from post-concussion syndrome, his headache and dizziness symptoms must be the result of a physical brain injury he incurred at Sears. I believe it is up to the jury to decide issues of causation and to make those inferences. The absence of justification for rewriting the causation element of tort is troubling in light of our constitutional guarantee of trial by jury.